STATE OF WEST VIRGINIA

*v.*

VIRGINIA COMSTOCK

(No. 10453)

Submitted April 15, 1952. Decided May 20, 1952.

Fox, JUDGE, not participating.

*Koontz & Koontz, Arthur B. Koontz* and *J. Henry Francis, Jr., J. J. N. Quinlan,* for plaintiff in error.

*Chauncey Browning,* Attorney General, *Thomas J. Gillooly,* Assistant Attorney General, for defendant in error.

RILEY, PRESIDENT:

In this criminal prosecution of State of West Virginia against Virginia Comstock, the defendant was indicted, tried and convicted in the Court of Common Pleas of Cabell County of involuntary manslaughter, in that, the indictment charges that she "unlawfully did kill and slay Pauline Cook, against the peace and dignity of the State", and was sentenced to be confined in the Cabell County jail for a term of six months. Upon application for writ of error to the judgment of the Court of Common Pleas of Cabell County, addressed to the Circuit Court of Cabell County, the writ of error was refused. The instant writ of error was granted to the order of the circuit court, refusing the writ of error to the judgment of the court of common pleas.

About the middle of June, 1950, Pauline Cook (hereinafter for purposes of convenience referred to as "Pauline" or "decedent"), a mental defective committed to the Barboursville State Hospital, on learning for the first time that she had a brother and sister in law living in the Village of Barboursville, who planned to secure her release on· parole, became extremely upset and psychotic. On Thursday, June 15, 1950, she was given a dose of phenobarbitol, and on Friday, the sixteenth, another dose of

phenobarbitol in tablet form was attempted, but she spit it out. On Sunday, June eighteenth, she appeared "dopey" to her relatives. On that occasion she appeared to be very emotional and knelt down before the defendant, Virginia Comstock, a trained nurse and the then superintendent of the Barboursville State Hospital, and said that she "was sorry for what she done"; but, when her relatives started to leave, the young woman ran out the door, and told Mrs. Comstock "she would be sorry for the way" she had done her. This was the last time Pauline's brother and sister in law saw her alive.

. On Sunday evening, June eighteenth, the defendant directed Mrs. Mary Arbuckle, a practical nurse employed at the Barboursville State Hospital, to give Pauline a dose of paraldehyde, which dose, according to Mrs. Arbuckle's testimony, consisted of approximately three dessert spoons of paraldehyde diluted with water. This dose was administered to Pauline about six o'clock on that evening, but within a few minutes it was vomited, and it apparently had no other effect on Pauline. That night Pauline was highly nervous and was violent for a time. She jumped out of bed, threw herself on the floor, and ran to the other patients in the ward and shook them. Her condition was such that an attendant had to remain with her through the night. On the following morning she was still highly psychotic, running through the ward and halls shouting and throwing herself to the floor. Her throat was full of strings of mucous and phlegm, which she pulled out and spit from her mouth. About ten o'clock that morning Mrs. Arbuckle reported Pauline's mental condition to the defendant, who directed that she be given "a dose of paraldehyde". This dose was given about ten-thirty in the morning, some force being required to administer it, and it took effect almost immediately.

One Virgie Lewis, a former employee of the Barboursville State Hospital, who was present on the morning of June nineteenth, at the time the dose of paraldehyde was given, testified, without substantiation, that large purple splotches appeared on Pauline's face; but Mrs. Arbuckle

testified that she did not see such splotches appear on Pauline's face and that she would have seen them if there had been any.

There is evidence to the effect that, after the second dose of paraldehyde had been given on Monday morning, Pauline's lips became very red and she was flushed and warm. Mrs. Arbuckle, at the suggestion of one of the attendants, summoned the defendant to examine Pauline, and the defendant ordered Pauline moved to a window and had an ice pack placed on her head. The patient was later given some coffee. The defendant then called Dr. Edwin Reaser, Superintendent of the Huntington State Hospital and the medical consultant for Barboursville State Hospital, who advised her to send Pauline to the Huntington State Hospital in an ambulance, which was done a short time later.

On admission to the Huntington State Hospital about twelve-thirty o'clock in the afternoon of June nineteenth, Pauline was found to have a temperature of 102.8° and lobar pneumonia of the lower right lung. Her lips were very red and parched and crusted with what appeared to be fever blisters, the inside of her mouth was white, and her mouth and throat were full of mucous. As the result of her treatment at the Huntington State Hospital, the pneumonia seemed to clear up, and her lips, while still crusted, had healed to some extent. At the Huntington State Hospital she was given penicillin, duracillin, and other prescribed treatment and medications; but on June twenty-fourth in the evening her temperature rose sharply and she died shortly before midnight of that day.

The doctors and pathologists who examined Pauline agreed that she died of pneumonia of the lower right lung; and that had she died from an overdose of paraldehyde, she would have been blue and cynotic with labored breathing, and she would have died within a few hours after the administration of the alleged overdose of paraldehyde. After the paraldehyde had been given to her on Monday, June nineteenth, Pauline though flushed, became relaxed,

without labored breathing, and lived five days thereafter without developing any of the symptoms of an overdose of paraldehyde.

A statement by Dr. Van De Wetering, the physician who attended decedent on her entry into the Huntington State Hospital, discloses that his examination showed that decedent was suffering from bronchopneumonia within two hours after she was given the allegedly fatal dose of paraldehyde on Monday morning, June nineteenth. However, Dr. Hodges and Dr. Henry D. Hatfield testified that bronchopneumonia would require a development of twelve to twenty-four hours before it could be detected by an external medical examination.

Of the two doses of paraldehyde administered by Mrs. Arbuckle, the first had no effect on the patient because decedent almost immediately after its administration vomited the dose. The defendant gave no orders as to the amount of paraldehyde or as to dilution, but merely on each occasion directed that decedent be given "a dose of paraldehyde". This record discloses, without substantial contradiction, that while the defendant was superintendent at the hospital, it was customary to give three dessert spoons diluted with water, in accordance with directions given by Dr. Reaser, who was deceased at the time of the trial. Mrs. Arbuckle testified for the State, and her testimony is without contradiction, that the dose given on Sunday evening, June eighteenth, was prepared by her in the ward in a tablespoon, which was used as the measuring device; that she placed three tablespoons, not full, of paraldehyde in a paper cup, so that, as far as this record discloses, the dose did not amount to more than three dessert spoonsful diluted with water. Neither the attendants who were present at the time the Sunday dose was given, nor State's witnesses, Ruth Agnes Gibson and Virgie Lewis, knew how much paraldehyde was given to decedent on Sunday night, June eighteenth, or whether it was diluted. Mrs. Arbuckle testified that she prepared the Monday, June nineteenth, dose downstairs in the pharmacy of the hospital, using a dessert spoon to measure

three dessert spoons of paraldehyde diluted with water. State's witness, Virgie Lewis, corroborated Mrs. Arbuckle as to this. She did not, however, know the amount of the dilution of the paraldehyde, other than that she testified that defendant, when she was on the ward, told Mrs. Arbuckle not to dilute the paraldehyde. But both State's witnesses, Mrs. Gibson and Mrs. Arbuckle, testified positively that the defendant was not on the ward in which decedent was a patient, until after the Monday dose had been given, and this is borne out by the fact that the evidence adduced, without contradiction, shows that during the previous night Mrs. Comstock had stayed up all night with another patient. The evidence concerning the Monday morning dose is contradicted by State's witness, Mrs. Gibson, who testified that she saw Mrs. Arbuckle mix the Monday dose in the ward, in which decedent was a patient, in a tablespoon and that the paraldehyde was undiluted.

Mrs. Arbuckle testified that she refilled the two-ounce bottle, which was introduced in evidence as "State's Exhibit Number 3", with paraldehyde before measuring the second dose, and thereafter measured the second dose from it. The bottle was a little over half full when given to sergeant Langford of the West Virginia Department of Public Safety; and thereafter Technical Sergeant Shanholtzer of the Department of Public Safety, and plaintiff's witness, Dr. Frank C. Hodges, each took a sample from the bottle. Thus it seems true, as counsel for defendant state in their brief, that on the occasion of the measuring of the second dose, Mrs. Arbuckle measured out approximately 24-26 cc paraldehyde for that dose; and it would have been impossible for her to have taken three tablespoonsful, which would have been 44 cc, from the bottle, as the State contends.

State's witness, Dr. Allen W. Scholl, professor of chemistry and head of the Department of Chemistry at Marshall College, testified as to the presence of twenty-seven per cent acetic acid in the sample of paraldehyde which was given Pauline. A quantitative analysis of the Barboursville paraldehyde disclosed that it was composed of

twenty-seven per cent acetic acid; one and one-half per cent acid aldehyde, and seventy-one and one-half per cent paraldehyde, which totals one hundred per cent. Dr. Scholl testified that it required forty-five times as much alkali to neutralize the acetic acid in the Barboursville paraldehyde as was required for the paraldehyde obtained from the drug store.

Using the Barboursville paraldehyde and United States Pharmacopoeia paraldehyde, obtained from the "Medical Arts Supply", evidently an ethical drug store in Huntington, this witness experimented with egg whites and white rats. Dr. Scholl testified that an egg white overlaid with pure paraldehyde was not "cooked", but an egg white which was overlaid with the Barboursville paraldehyde coagulated. The application of pure paraldehyde on the skin of a white rat produced no visible injurious effect; but when the Barboursville paraldehyde was applied to the skin of a white rat, white blisters appeared, which started as small circular spots, which became larger and larger, and after a period of five days produced open sores and scabs, which were initially brown, but. eventually turned black.

Dr. Scholl further testified that the United States Pharmacopoeia normal dose of paraldehyde is four cc., or one teaspoonful. However, the witness testified that the entire decomposition of the Barboursville paraldehyde might have occurred during the five months intervening between Pauline's death and the time he made his analysis and experiments.

The record discloses, without contradiction, that the Barboursville paraldehyde had been administered to at least five patients in the same dosage that was given to Pauline during the six months immediately preceding her death without causing any ill effects on the patients; and that the dose administered to Pauline on Sunday evening, June eighteenth, which Mrs. Arbuckle testified consisted of three dessert spoons of paraldehyde diluted with water,

did not blister or burn her mouth, although it passed through her mouth twice, first when taken, and, second, when vomited.

State's witness, Dr. Frank C. Hodges, a pathologist practicing in the City of Huntington, testified, that a sample of the paraldehyde from the two-ounce bottle introduced into evidence as "State's Exhibit Number 3", contained four times as much acetic acid as is found in ordinary distilled vinegar.

Dr. Siegfried Werthammer, a pathologist, who had performed a complete autopsy, both visual and microscopic, upon the body of Pauline before rigor mortis had set in and before embalming, testified that the autopsy disclosed that decedent had bronchopneumonia of the lower right lung, pulmonary edema from pneumonia, acute inflammation of the esophagus, and eschars on her lips and in her mouth, but that he found no pathological change in the stomach and nothing in the lungs which is not ordinarily found in cases of pneumonia.

Two days after decedent's body had been embalmed and rigor mortis had set in, State's witness, Dr. Hodges, performed a partial autopsy on decedent's body, which did not embrace an examination of the mouth, or a microscopic examination of the esophagus and lungs. From his visual nonmicroscopic examination of the esophagus, this witness testified that its lining was "necrotic" (that is, mortification of the tissue of the esophagus). Dr. Hodges did not, and evidently could not, due to the unfavorable conditions under which he performed the autopsy, confirm or deny the specific findings disclosed by Dr. Werthammer's detailed visual and microscopic examination of decedent's body.

The testimony of State's witnesses, Dr. Werthammer and Dr. Hodges, and defendant's witnesses, Dr. H. D. Hatfield and Dr. John Pearson, both general medical practitioners practicing in the City of Huntington, was directed in part to the question whether an overdose or a dose of paraldehyde, containing an excessive amount of acetic

acid, that is, twenty-seven per cent, would cause a person to contract pneumonia, or where there is pneumococci bacteria already present in the bronchial tubes and lungs would produce a predisposition to pneumonia, which would result in an active case.

Dr. Hodges was asked on direct examination a rather lengthy hypothetical question, which contained the assumptions that on Sunday evening, June eighteenth, the patient was given three tablespoonsful of the Barboursville paraldehyde undiluted, and again on Monday morning, June nineteenth, she was given an additional dose of three tablespoonsful of the same paraldehyde; that at the time decedent was admitted to the Huntington State Hospital she had a temperature of 102.8 degrees; that she had eschars on her lips and mucous in her mouth and throat; that she experienced difficulty in speaking and swallowing and complained of "much pain" in her mouth and throat; that the mucous membrane of her mouth and throat had sloughed away; and that shortly before midnight on June twenty-fourth she died. On the basis of these assumptions Dr. Hodges was asked whether "the overdose of the undiluted substance contained in 'State's Exhibit Number 3' could have caused the pyogenic pneumonia of the lower lobe of the right lung which resulted in" decedent's death, to which he answered, "I think so"; and "I think it caused her death."

And further on direct examination Dr. Hodges was asked, and, over general objections, answered affirmatively, the following hypothetical questions:

"Q   I will ask you whether or not a registered nurse should know whether or not paraldehyde should be diluted?
\*\*\*
"Q   (By Mrs. Wheatley)   Doctor, of your own knowledge, do you know whether or not a nurse in her course of study has a course in materia medica?
\*\*\*
"Q   (By Mrs. Wheatley)   Then can you state, Dr. Hodges, whether or not a registered nurse

should know that paraldehyde should be diluted before administered?

\* \* \*

"Q (By Mrs. Wheatley) Doctor, would you say that a drug or substance such as was given from the bottle used in the Barboursville State Hospital and containing acid to a degree which has been presented in Court with the properties which have been described would cause burning of the lips, eschars of the lips and destruction of the lining of the esophagus?"

He was also asked, "Would you say that a patient on which such damage had been inflicted would develop pneumonia as a result of such damage," to which he answered, "It could." In answer to the inquiry, "How would pneumonia be caused by such damage," he answered: "The burning and the swelling of the lips and of the throat and tongue causes a great soreness with inability to properly swallow and the erosion or the destruction of the swallowing tube lining would further contribute to that patient's inability to properly swallow. Also, the amount of the drug would cause an excessive flow of saliva. That means that some of that saliva wouldn't go down the swallowing tube. Some of it would go down the breathing tube or the esophagus, and that material containing mucus and bacteria, would be taken down to the smaller bronchial tubes and there an inflammation would be started and that would be the starting of the development of a pneumonia." And, more specifically, he was asked: "What in your opinion caused the death of this patient, Pauline Cook", to which he answered, "Pneumonia."

But Dr. H. D. Hatfield, a witness for the defendant, testified on direct examination that it would be impossible for *any* dose of paraldehyde to cause pneumonia, saying, "Pneumonia is caused by a specific germ. The only thing that paraldehyde could do would be to produce a counter-irritation of the lung structures"; and, more specifically, this witness testified that the administration of undiluted paraldehyde containing twenty-seven per cent acetic acid, which the State claims decedent received and vomited on June eighteenth, and the undiluted dose in like amount

on the following day, "* * * wouldn't produce a pneumonia * * *. But that would produce a predisposition, that is, a weakened condition, that the pneumonia germs were already in there, that it might become an outspoken case of pneumonia."

This witness further testified that in his practice he would give a sufficient dose of paraldehyde to achieve the desired result of quieting the patient. Testifying from a medical text book, which the witness evidently thought was authority on the immediate subject, the witness read, "Recently paraldehyde has been recommended for intravenous anaesthesia", which medical text book the witness testified states that a dose of paraldehyde is from one-half to one ounce, or eight drams or eight teaspoonsful. At this point we note that a dessert spoon is defined as, "A domestic measure equal to about 2 dr. (8 Cc)". Scott Gould's Medical Dictionary, 3d ed., page 405. So the dosage for intravenous administration of paraldehyde in neurological cases of eight teaspoons of paraldehyde would amount to four dessert spoons, whereas this record preponderates to the effect that the patient was given, in pursuance of the direction of Dr. Reaser, only three dessert spoons of paraldehyde.

Quoting from the United States Pharmocopoeia, Dr. Hatfield testified that: " 'A minimal effectual adult dose of paraldehyde is at least four cc or sixty minims'—that's a teaspoonful—'and fifteen to thirty cc, one-half to one ounce, may be administered with safety'—one ounce, perfect safety, and I think that's true." Again it may be noted that an ounce of paraldehyde is equal to four dessert spoonsful.

Dr. Hatfield in giving the last-quoted testimony evidently did not confine himself to the administration of paraldehyde intravenously for he read further from the United States Pharmacopoeia: "Paraldehyde is given by mouth, rectum or intravenously." From Dr. Hatfield's testimony it appears that the two latter methods of administration, that is by rectum or intravenously, are employed because of the very unpleasant taste of the drug. This eminent

medical witness further testified, and without the least contradiction, that if Pauline Cook's death had ensued directly from the use of paraldehyde, the dosage would have resulted in her death from four to six hours after its administration; and, as this testimony is uncontradicted, it is again important that we note that though the last dose of paraldehyde was given to decedent about ten o'clock on Monday morning, June nineteenth, her death did not occur until a short time before midnight on June twenty-fourth.

State's witness, Dr. Werthammer testified that the eschars in decedent's mouth were crusted fever blisters; that the esophagitis was acute and was not as old as the pneumonia; that there was no evidence of any pathological change in decedent's stomach, which would have been present if a caustic substance had gone through the mouth and esophagus; that a microscopic study of the esophagus showed only a diffused inflammation; and that there was no evidence of any caustic substance having been aspirated into the bronchial tubes or lungs.

On cross examination Dr. Werthammer answered the question whether the esophagitis which the witness' examination of decedent's body on autopsy disclosed, caused the pneumonia, by saying: "I do not believe that it is caused by a caustic substance for one reason: if there is a caustic substance which sets off a severe inflammation of the esophagus, a little bit should enter the stomach. The stomach was perfectly normal here. So it is very rare in my experience to see an inflammation due to corrosion by a strong acid or lye or something like that only affecting the esophagus and not affecting the stomach. Therefore, I say I do not believe but I cannot prove it." This witness attributed the eschars on decedent's mouth and lips and the irritation of the esophagus to the high fever which accompanied and preceded the pneumonia. And further on cross examination Dr. Werthammer testified that a further reason for his opinion that the pathology of the esophagus was not due to a caustic substance is that if a caustic substance is swallowed, it is accompanied

by a constriction of the lining of the esophagus, adding, "The esophagus starts to constrict above and that wave of constriction travels down and pushes the material which is swallowed down. We call that peristalsis of the esophagus. * * * The lining [of the esophagus] makes folds. If you have a caustic substance in the esophagus which produces burn, inflammation, excoriation, eschars, whatever you call it, the tip of the folds will be chiefly affected. It will be chiefly affected because the caustic substance has difficulty to penetrate between the folds. If we unfold the esophagus and look at it, then we have streaks of inflammation. That's what you see in a caustic injury to an esophagus—streaks." And on this basis the witness reasoned that as the irritation of the lining of decedent's esophagus was diffused and not streaked, the high fever which accompanied the pneumonia caused the inflammation of the esophagus, and not the alleged excessive percentage of acetic acid in the Barboursville paraldehyde.

Defendant's witness, Dr. Charles A. Zeller, a psychiatrist of wide experience and the then superintendent of Weston State Hospital, in the presence of the jury, held in his mouth an ounce of the Barboursville paraldehyde without experiencing any ill effects.

And defendant's witness, Dr. John Pearson, a general medical practitioner of Huntington, on redirect examination testified that if a caustic substance was so strong that upon being swallowed it would cause purulent esophagitis, there would, in his opinion, have been some pathological change in the stomach; "I have never seen one without it."

The evidence of both the State and the defendant is to the effect that decedent, Pauline Cook, was a mental defective, who, at the time the doses of paraldehyde were given to her, was in a state of great mental excitement and psychotic to an extreme degree; and defendant's evidence is without contradiction that a mental defective requires more than the normal dose of paraldehyde in order to bring about the desired result of calming the patient.

The defendant in her brief assigns six points of error, the basic one being that the verdict of the jury is contrary to the law and the evidence, in that: (a) The Barboursville paraldehyde did not cause Pauline's death, and (b) the paraldehyde was not administered in an unlawful manner. For convenience we shall discuss this point initially.

Whether the Barboursville paraldehyde caused decedent's death depends upon the happenings in the Barboursville State Hospital on the Sunday night of June 18, 1950, and the following Monday morning, and the testimony of the various medical witnesses, psychiatrists and pathologists who testified on behalf of the State and the defendant on the all-important question whether the decedent would have contracted the bronchopneumonia from which she died, if the allegedly fatal dose of paraldehyde had not been given on the morning of June 19, 1950. Without doubt at the time the two doses of paraldehyde were given, the decedent, an unfortunate young woman who had been born in the Huntington State Hospital when her mother was confined there, became highly psychotic when she learned that she had a brother and sister in law in Barboursville, who were attempting to procure her release on parole, and the paraldehyde was administered to her under the general direction of Dr. Reaser, now deceased, who was one of the outstanding psychiatrists and physicians in this State, and in turn administered by Mrs. Arbuckle under the direction of the defendant, Virginia Comstock, a trained nurse, and the then head of the Barboursville institution.

The evidence adduced by the State which most directly bears upon the instant question is the testimony of State's witnesses, Dr. Allen W. Scholl, professor of chemistry and head of the Department of Chemistry of Marshall College, and Dr. Frank C. Hodges, a pathologist, practicing in the City of Huntington and vicinity. Dr. Scholl made experiments with the Barboursville paraldehyde on egg whites and white rats, and his testimony tends to establish the fact that the Barboursville paraldehyde was of a strongly

caustic nature. In fact, at the time he examined the paraldehyde some five or six months after decedent's death, it was shown to have an acetic acid content which required forty-five times as much alkali to neutralize as was required in the case of commercial paraldehyde, which was obtained from a drug store in Huntington. Dr. Hodges, this record discloses, unlike State's witness, Dr. Werthammer, the latter of whom made a complete autopsy on decedent's body within two hours after her death and before rigor mortis had set in, made only a partial autopsy two days after decedent's death and after the body had been embalmed, the autopsy necessarily having been made under very unfavorable conditions. This witness made no examination of decedent's mouth and throat, inasmuch as her mouth was closed by stitching, and his examination of her lungs, bronchial tubes and esophagus was visual and not microscopic. At the time of his autopsy and examination rigor mortis had already set in. Having answered affirmatively that a drug or substance such as was given from the bottle used in the Barboursville State Hospital, introduced into evidence as "State's Exhibit Number 3", would cause "burning of the lips, eschars of the lips and destruction of the lining of the esophagus," he testified in response to the inquiry, "Would you say that a patient on which such damage had been inflicted would develop pneumonia as a result of such damage," that "It could." And in answer to a rather lengthy hypothetical question containing, among other things, the hypothesis that decedent was given on the evening of June eighteenth, and on the following morning of June nineteenth, 1950, three undiluted tablespoonsful of the Barboursville paraldehyde contained in "State's Exhibit No. 3", whether the witness could testify that such administration "*could* have caused the pyogenic pneumonia of the lower lobe of the right lung which resulted in the death of said Pauline Cook," Dr. Hodges testified, rather indefinitely and necessarily so because in the circumstances presented to him he did not have an opportunity to make as thorough examination as had Dr. Werthammer, that "I think so"; and "I think it caused her death."

Bearing in mind that for the instant conviction to stand in this Court the evidence must be such that it can be said that the State has established defendant's guilt beyond a reasonable doubt, let us further examine the record to see whether the evidence rises to the high standard required of such proof, which prevails in this jurisdiction in all criminal cases.

The testimony of State's witness, Dr. Siegfried Werthammer, and defendant's witnesses, Dr. H. D. Hatfield and Dr. John Pearson, bears pertinently on the important question under consideration. Of these witnesses Dr. Werthammer had the best opportunity to make such examination and observation as might be required to ascertain the cause of decedent's death, because he alone of all the physicians, pathologists, and psychiatrists who testified in this case, made, in the most favorable circumstances, a complete autopsy of decedent's body, consisting of a visual as well as a microscopic examination of the lungs, bronchial tubes and esophagus. Without the least contradiction or contravailing evidence, this well qualified medical witness gave two very convincing reasons supporting his opinion that decedent's death was caused by pneumonia, and not by the pathological condition of her esophagus, the latter of which followed, the witness testified, in point of time the pneumonia: (1) That a visual, as well as a microscopic examination of the lining of the stomach disclosed no pathological change thereof, which this witness testified, and in this he is corroborated by the defendant's witness, Dr. John Pearson, would occur if the esophagitis had been caused by the swallowing of a caustic substance; and (2) the fact that this witness' examination of decedent's esophagus disclosed a diffused pathological condition throughout its length, whereas, in case a caustic substance had been swallowed, peristalsis of the esophagus during the process of swallowing would have caused "streaks of inflammation. That's what you see in a caustic injury to an esophagus—streaks."

The testimony of Dr. Hatfield, defendant's witness, based as it was upon the complete autopsy made by Dr. Wert-

hammer, and drawing as he did from his long experience in the learned profession which he has graced for many years, testified in a very informative manner on the question whether the Barboursville paraldehyde caused decedent's death. Specifically, he testified that it would be impossible for *any* dose of paraldehyde to cause pneumonia, saying "Pneumonia is caused by a specific germ. The only thing that paraldehyde could do would be to produce a counterirritation of the lung structures." This witness testified that the administration of undiluted paraldehyde, containing twenty-seven per cent acetic acid, which the State claims decedent received and vomited on June eighteenth, and of which she received a dose in like amount undiluted on the following day, "* * * wouldn't produce a pneumonia * * *. But that would produce a predisposition, that is, a weakened condition, that the pneumonia germs were already there, that it might become an outspoken case of pneumonia." Dr. Hatfield testified that in his practice he was accustomed to give a sufficient dose of paraldehyde to achieve the desired result of quieting the patient. He further testified that if Pauline Cook's death had ensued directly from the use of the Barboursville paraldehyde, the dosage would have resulted in the patient's death from four to six hours after its administration. It is therefore important to note that, though the last dose of paraldehyde was given to decedent on Monday morning, June nineteenth, her death did not occur until a short time before midnight on June twenty-fourth.

Moreover, from this record it seems clear that the decedent was not given an overdose of the Barboursville paraldehyde. Dr. Hatfield read from United States Pharmocopoeia, as follows: " 'A minimal effectual adult dose of paraldehyde is at least four cc or sixty minims'—that's a teaspoonful—'and fifteen to thirty cc, one-half to one ounce, may be administered with safety'—one ounce, perfect safety, and I think that's true." And Dr. Weaver B. Roger, State physician at Huntington State Hospital, with forty-three years experience in the practice of medicine,

testified that he had given orally four ounces of paraldehyde in two doses without ill results.

So, according to Dr. Hatfield, a minimal effectual dose would amount to four dessert spoonsful, and according to Dr. Roger sixteen dessert spoonsful could be given without ill effects; whereas, this record preponderates to the effect that the patient was given, pursuant to Dr. Reaser's direction, only three dessert spoonsful of paraldehyde.

In addition to this testimony there is the uncontradicted testimony that of all drugs designed to superinduce calmness in highly excited and psychotic patients, paraldehyde is the safest. And, finally, bearing on this question, Dr. Charles A. Zeller, the then Superintendent of Weston State Hospital, in the presence of the very jury which convicted this defendant held an ounce of the Barboursville paraldehyde in his mouth and suffered no ill effects.

The evidence here, in our opinion, seems to establish, rendering the question one of conjecture for the jury, that the Barboursville paraldehyde may have undergone chemical changes from the time the last dose was administered to the decedent until it was examined six months later; and the fact remains, uncontradicted in this record, that the same paraldehyde was administered to five other patients during the six months period from the administration of the last dose to decedent until decedent's death without any dire results.

So we are of opinion that the evidence in this case preponderates to the effect that the jury could not find beyond a reasonable doubt that the paraldehyde administered to decedent by Mrs. Arbuckle caused the bronchopneumonia which ultimately resulted in decedent's death, and, that being so, it is immaterial whether the paraldehyde was administered lawfully or unlawfully.

Nevertheless, it is fully established in this record that Mrs. Comstock directed Mrs. Arbuckle to administer "a dose of paraldehyde"; that the dose administered was in conformity with the direction of the medical consultant

of the Barboursville State Hospital; that the record contains no substantial evidence that the doses were undiluted; and, if undiluted, there is no substantial showing that the defendant knew that they were undiluted.

In these circumstances, we are of opinion, and so hold, that the verdict of the jury bearing on the question of defendant's guilt or innocence is not established by the evidence. For this reason alone we reverse the judgments of the Circuit Court and the Court of Common Pleas of Cabell County, set aside the verdict of the jury, and grant defendant a new trial.

But as this case may be retried on remand, we deem it advisable and pertinent to address ourselves to the five other points of error assigned in defendant's brief. We shall discuss them *seriatim* as follows: (1) State's instructions Nos. 4 and 5 are erroneous and were prejudicial to the defendant; (2) the evidence of alleged acts of mistreatment of other patients by the defendant was irrelevant and collateral to the issue of defendant's guilt, and its admission in evidence, as well as the court's direction that the evidence be considered by the jury for the purpose of showing defendant's motive and intent was prejudicially erroneous; (3) the court's ruling in permitting the hypothetical questions to be addressed to and answered by State's witnesses, Dr. Frank C. Hodges and C. F. Dawson, and in permitting long and allegedly prejudicial colloquies in considering and sustaining the State's objections to the hypothetical questions, which defendant's counsel addressed to State's witness, Dr. Siegfried Werthammer, on cross examination and to defendant's witness, Dr. H. D. Hatfield, on direct examination, were prejudicially erroneous to the defendant; (4) that the court erred in examining the witness, Ruth Burkhammer, a former inmate of Barboursville State Hospital as to her competency without the presence of the defendant and the court reporter; and (5) the court erred in overruling the demurrer to and the motion to quash the indictment

on the ground that the grand jury was irregularly constituted, and, therefore, the indictment was void.

The court, over defendant's objection, gave State's instructions Nos. 4 and 5.

State's instruction No. 4 reads:

> "The court further instructs the jury that if after having heard and considered all the evidence in this case you believe beyond a reasonable doubt that the usual dose of paraldehyde is one to two teaspoon full well diluted with water or some similar liquid, and that the defendant, Virginia Comstock, as a registered nurse, either knew or should have known that it would be dangerous to administer more than the usual dose or fail to dilute it properly, and if you further believe beyond a reasonable doubt that paraldehyde over a long period of time undergoes chemical changes which result in increasing its acid content or otherwise changing its form so that it becomes dangerous to use, and that the defendant knew that the paraldehyde then in the Barboursville State Hospital had been there for many years and that as a nurse, she either knew or should have known that it might be unsafe and dangerous to administer the said paraldehyde, but that she, with such gross, culpable, wanton, heedless, and careless negligence as to indicate a callous disregard of human life and the probable consequences of her act, ordered to be administered to Pauline Cook the doses of paraldehyde as testified in this case she thereby acted in an unlawful manner, and if you further believe beyond a reasonable doubt that the administering of the said paraldehyde either caused or contributed to the said Pauline Cook becoming infected with pyogenic pneumonia of the lower lobe of the right lung from which she died, then you should find the defendant guilty of involuntary manslaughter as charged in the indictment in this case."

The specific objection to this instruction is that, though the record discloses that decedent was a mental defective and that mental defectives require more than the usual

dose of paraldehyde, the instruction is based upon the assumption that more than the usual dose would be dangerous to the patient.

State's instruction No. 5 differs from State's instruction No. 4 only in the cause of death. The instruction has the same vice contained in State's instruction No. 4, and for that reason the defendant objects to this instruction.

These instructions are binding and are erroneous in that they do not cover defendant's theory of the case: that more than the usual dose of paraldehyde should have been given Pauline Cook, who is a mental defective. 10 M. J., Instructions, Section 20. The instructions are not cured by other instructions, and the giving of them, in our opinion, constitutes reversible error. 10 M. J., Instructions, Section 46, Note 16, and cases cited thereunder.

During the course of the trial State's witness, Virgie Lewis, was permitted to testify, over defendant's objection, that while the witness was employed at Barboursville State Hospital, and the defendant was superintendent thereof, she had seen patients who were not violent shackled; that she had seen one Lydia Corley, a patient, shackled or tied to a chair; and likewise, over defendant's objection, State's witness, Mary Harbour, was permitted to testify that she saw defendant in the dining room of the hospital, while talking in a loud and angry voice, hold an aged patient by the hair, push food into her mouth, and throw water in her face, so as to compel the patient to swallow food, causing the patient to scream. The court, over defendant's objection, read to the jury the following statement: "The court advises the jury that the incidents of other acts of treatment of inmates of the Barboursville State Hospital by the defendant or under her orders may be considered by them for the purpose of showing motive or intent, if any, of the defendant in considering the charge specified in the indictment in this case, if such acts have some logical connection with and tend to establish the said charge and as to whether or not such acts and the act charged in this indictment is a part of a sys-

tem of criminal action, but they can be considered only as an indictment and they must be satisfied by the evidence beyond a reasonable doubt that the specific offense itself has been established."

The admission of the foregoing evidence as to other acts of misconduct and the court's direction to the jury in regard thereto, in our opinion, constitutes reversible error. The other acts of misconduct have no connection whatever with the crime with which the defendant is charged. Certainly, the evidence of those acts is not admissible for the purpose of showing criminal intent. The indictment charges the defendant with involuntary manslaughter. Specifically, it charges that the defendant "unlawfully did kill and slay one Pauline Cook, against the peace and dignity of the State."

The defendant's intent does not enter into the crime with which the indictment charges her. It is not an element of the crime of involuntary manslaughter. In *State v. Lawson,* 128 W. Va. 136, pt. 2 syl., 36 S. E. 2d 26, it was held: "A person may be guilty of involuntary manslaughter when he performs a lawful act in an unlawful manner, resulting in the unintentional death of another."

It is unnecessary for us to discuss in detail the specific grounds of objection contained in defendant's brief to the ruling of the trial court in permitting plaintiff's counsel to give to Dr. Hodges the hypothetical questions bearing on the cause of Pauline Cook's death, and, over defendant's objection, to permit the witness to give the opinion that he thought an overdose of paraldehyde caused decedent's death. It is well settled in this jurisdiction that an objection, general in form, to a hypothetical question based on the inclusion in the hypothesis of the question of matters not supported by the evidence, or the omission of pertinent matters shown by the evidence is insufficient to ground reversal.

In *State v. Lewis,* 133 W. Va. 584, 57 S. E. 2d 513, it was stated that, "A hypothetical question need not cover all the facts but the party propounding the question may

assume facts fairly inferable from the evidence which tends to support his theory of the case." "The rule recognized by the decisions of this Court is that when a hypothetical question is objected to on the ground that it does not contain a full statement of the facts relied on, and the omitted facts are not pointed out in the objection, the only remedy of the objector is to develop the omitted facts on cross examination and elicit the opinion of the witness when those facts are supplied." *State* v. *Lewis, supra.* See also *Parr* v. *Coca-Cola Bottling Works of Charleston,* 121 W. Va. 314, pt. 5 syl., 3 S. E. 2d 499; *Hazelrigs* v. *The City of Huntington,* 116 W. Va. 757, 182 S. E. 877; *Adams* v. *G. C. Murphy Co.,* 115 W. Va. 122, 174 S. E. 794. The rule is stated generally in point 5 of the syllabus of the *Parr* case, that a general objection to a hypothetical question on the ground that it either omits facts, which should be included, or assumes facts, which are not established by substantial evidence in the record, or both, is not sufficient to base error, is stated as follows: "It does not constitute error to permit a hypothetical question to be answered to which only a general objection is interposed."

To this rule an exception, more apparent than real, is stated in the *Hazelrigs* case, that a general objection to a hypothetical question is sufficient to ground error, where the question to which the witness responds fails to connect the answer to the circumstances upon which plaintiff seeks recovery, or upon which the defendant relies for his defense.

Here, however, the objection to the hypothetical question addressed to Dr. Hodges, as stated for the first time in defendant's brief, is that the hypothesis of the question states facts not supported by the evidence, or pertinent facts shown by the evidence are omitted therefrom. So this case comes squarely within the rule set forth in point 5 of the syllabus of the case of *Parr* v. *Coca-Cola Bottling Works of Charleston, supra.*

The objections to the hypothetical questions addressed to Dr. Hodges and Pharmacist C. F. Dawson, concerning

the knowledge acquired by nurses during their training is without substantial merit. These objections are to the effect that the questions were not related to the time when defendant, Virginia Comstock, took her nurse's training prior to 1915.

The defendant's objections to the hypothetical questions addressed to Dr. Werthammer and Dr. Hatfield, being general, should have been overruled for the reasons stated in our discussion of the objections to the hypothetical question asked plaintiff's witness, Dr. Hodges.

When the State called Ruth Burkhammer, as a witness, she having been a former inmate of Barboursville State Hospital, defendant's counsel objected to the witness testifying on the ground that she was not competent, and on the further ground that the court examined the witness as to her competency in chambers, in the absence of counsel and the court reporter. "The question of competency of a witness is a question for the court and not for the jury; and when a witness is offered in a criminal case, and doubt is raised as to the competency of such witness, it is the duty of the court to determine the question upon a careful examination of the witness as to age, capacity and moral and legal accountability." *State* v. *Michael,* pt. 1 syl., 37 W. Va. 565, 16 S. E. 803. Of course, the question of such competency of a witness is always addressed to the sound discretion of the judge "* * * and if it appears that a careful and full examination as to the age, intelligence, capacity, and moral accountability has been made by the judge and counsel before the jury, and the trial judge has concluded that she is competent, the appellate court will not reverse the ruling which permits the evidence to be introduced unless it is apparent that it was flagrantly wrong." *State* v. *Price,* 96 W. Va. 498, 501, 123 S. E. 283.

The court of common pleas, in our opinion, did not err in examining the witness in the absence of counsel and the court reporter. We think, however, that it is the better

practice for such examination to be conducted by the judge in the presence of counsel and the court reporter.

We are not at liberty to decide the question whether the indictment is void on the ground that the grand jury was irregularly constituted. Defendant's counsel contend that when the Sheriff of Cabell County returned his *venire facias* "not found" as to Jury Commissioner Elmer Canterbury, the Clerk of the Court of Common Pleas of Cabell County, as shown by the order of that court, entered on July 28, 1950, appointed C. M. Gohen as special jury commissioner in the place of Canterbury, and, in so doing, he usurped the power of the court of common pleas under Code, 52-1-3, which provides that:

> "There shall be two jury commissioners of the circuit court of each county. * * * They shall be appointed by the circuit court, or the judge thereof in vacation of their respective counties. * * * Vacancies caused by death, resignation or otherwise, shall be filled for the unexpired term in the same manner as the original appointments. * * *
>
> "There shall be two jury commissioners for every court of limited jurisdiction, who shall be appointed by such courts, or the judges thereof, in vacation, respectively, * * *."

The clerk's appointment of Gohen appears for the first time as an exhibit to the petition for a writ of error to this Court. In *Hartman* v. *Corpening*, 116 W. Va. 31, pt. 1 syl., 178 S. E. 430, this Court held: "On error, the appellate review of a ruling of the circuit court is limited to the very record made there." See also *State* v. *Beatty*, 51 W. Va. 232, pt. 5 syl., 41 S. E. 434; *Bell* v. *Huntington Development and Gas Company*, 106 W. Va. 155, pt. 1 syl., 145 S. E. 165; *City of Huntington* v. *Huntington Water Corporation*, 135 W. Va. 568, 64 S. E. 2d 225. Under West Virginia Constitution, Article VIII, Section 5, "When a judgment or decree is reversed or affirmed by the supreme court of appeals, *every point fairly arising upon the record of the case shall be considered and decided,* * * *." (Italics supplied.) So, unless the instant point fairly arises upon

the record, we are not at liberty to consider it, and, in our opinion, it does not so arise.

There is nothing in the record in the case at bar which shows, or even indicates how the commissioners for the selection of the grand jury, which brought the instant indictment, were appointed. If, however, one or both of them was appointed by the Clerk of the Court of Common Pleas of Cabell County, and not by the court itself, or the judge thereof in vacation, Code, 52-1-3, has not been complied with. With the exception of an exhibit to the petition for a writ of error herein, designated as "Petitioner's Exhibit 'F' ", which is a certified copy of the order of the Court of Common Pleas of Cabell County, authorizing the allowance to the substituted or special jury commissioner, C. M. Gohen, of five dollars for his services as such jury commissioner, there is no reference to commissioner Gohen in this record. This order recites that C. M. Blake, Clerk of the Common Pleas Court of Cabell County, came and represented that he had appointed C. M. Gohen as special jury commissioner to select and draw a grand jury in the absence of Elmer Canterbury, the regularly appointed jury commissioner, but this order is not a part of the proceedings in the trial of this case. If the defendant had supported her motion to quash the indictment by proof bearing on the illegality of the appointment of special jury commissioner C. M. Gohen, and the court had then ruled on the motion to quash, the question would have been one fairly arising on the record under West Virginia Constitution, Article VIII, Section 5, and would be here for consideration.

Under the definition of manslaughter, contained in *State v. Lawson, supra,* the indictment, as heretofore stated, alleges that defendant "unlawfully did kill and slay one Pauline Cook, against the peace and dignity of the State" is sufficient in law, and the demurrer to it was properly overruled.

For the foregoing reasons the judgments of the Circuit Court and of the Court of Common Pleas of Cabell County

are reversed, the verdict set aside, and a new trial awarded.

*Judgments reversed;*
*verdict set aside;*
*new trial awarded.*