386 S.E.2d 839

**BABY BOY R., an infant, By his next next friend, PATRICIA R. and Patricia R.**

v.

**Lori VELAS, Protective Service Worker, W.Va. Department of Human Services, et al.**

No. 19015.

Supreme Court of Appeals of West Virginia.

Nov. 3, 1989.

Barbara L. Baxter, West Virginia Legal Services Plan, Inc., Wheeling, David McMahon, West Virginia Legal Services Plan, Inc., Charleston, for appellant.

Donald L. Hall, Asst. Atty. Gen., Commissioner—Taunja Willis–Miller, West Virginia Human Services, Charleston, for appellees.

BROTHERTON, Chief Justice:

This case involves a habeas corpus brought by Patricia R., the natural mother of Baby Boy R., which was sought in order to revoke a relinquishment of her infant child to the West Virginia Department of Human Services for the purposes of adoption. Patricia R. appeals from the ruling of the Ohio County Circuit Court, which concluded that, as a matter of law, the appellant was not entitled to the habeas corpus sought. For the reasons stated below, we affirm the decision of the Ohio County Circuit Court and conclude that the appellant is not entitled to the return of the child.

Patricia R. gave birth to the infant child (Baby Boy R.) at the Ohio Medical Center in Wheeling, West Virginia, on February 18, 1988, twelve days past her eighteenth birthday. Patricia was not married at that time, and the father of the child was not identified.

The appellee, Lori Velas, is a protective service worker employed by the West Virginia Department of Human Services, who was assigned to Patricia in December, 1987, after Patricia telephoned the West

Virginia Department of Human Services to obtain assistance with her pregnancy. The appellant was seventeen years old at the time of the contact, living with her mother, unemployed, and had dropped out of high school in her junior year. In addition to arranging for prenatal medical treatment and other social services, Ms. Velas counseled Patricia regarding plans for herself and the child after the birth. However, relinquishment of the child for adoption was not mentioned to Patricia by Ms. Velas prior to the birth of the child.

The day after the birth of the child, Ms. Velas took a foster care agreement form to the hospital to discuss with Patricia. For the first time, on February 19, 1988, Ms. Velas discussed relinquishment of the child with Patricia.[1] On that date, however, Patricia merely signed the foster care form, placing the baby in the temporary custody of the West Virginia Department of Human Services for a period of five days, until February 24, 1988, while considering the option of adoption.

On February 22, 1988, Ms. Velas returned to the hospital and took with her a form for voluntary relinquishment of parental rights. Patricia signed the four-page voluntary relinquishment form on February 22, 1988. Ms. Velas testified that she fully explained to Patricia that she was permanently terminating her parental rights and that Patricia understood the ramifications of that action. Patricia denies that she knew she was permanently relinquishing her parental rights, claiming that she did not know what she had signed and that she thought she had ten days to change her mind and get her baby back. Testimony of a notary public at the hearing indicated that she believed Patricia was upset and crying when she signed the form. Patricia's mother was also present when the form was signed and advised the

notary that she felt her daughter was doing what was best. A copy of the form was not given to Patricia until February 23, 1988, at Patricia's home.

On February 29, 1988, seven days after signing the relinquishment form, Patricia called to ask if the baby could be returned to her. Ms. Velas advised her again that the decision was a final one. Both Patricia and her mother called Ms. Velas several times between February 29 and March 18, 1988, asking that the baby be returned. During that period of time, the child was referred to the permanent planning unit for adoptive placement. On March 21, 1988, the child was placed for adoption.[2] Patricia then filed suit for habeas corpus in order to effect the return of the child.

Hearings were held in this matter on August 24 and 26, 1988, before the Honorable Ronald E. Wilson of the Circuit Court of Ohio County. On September 28, 1988, Judge Wilson, in his findings of fact and conclusions of law, concluded that Patricia was not entitled to the return of the child. After noting that the relinquishment signed by Patricia could only be set aside if it was made under duress or fraud, Judge Wilson concluded that the fact that she was a victim of "duress of circumstances" was not sufficient to invalidate the relinquishment. Judge Wilson found no evidence that she was induced to sign the form by any unlawful or unconscionable act of anyone from the Department of Human Services. Further, there was no evidence that she suffered from an inability to comprehend or from any mental weakness, although the court accepted Patricia's statement that she had difficulty understanding the nature of the consequences of the document. The court then acknowledged that there was no evidence that Ms. Velas or any other person sought to take advantage of her or misrepresent the facts, and that

1. It is a policy of the Department of Human Services for the social worker to avoid bringing up the subject of relinquishment until the natural parent does so first. In this case, Patricia claims that she did not introduce the subject and that Ms. Velas initiated the discussion. However, at the hearing held on August 24, 1988, Ms. Velas stated that the discussion was not prompted by her, noting that the area office

had received a phone call in which Patricia had stated she wanted to put the baby up for adoption.

2. The child is currently living with foster parents who hope to adopt him once this suit is concluded.

Patricia could not prove that Ms. Velas did anything to cause her to believe she could withdraw her relinquishment within ten days. Thus, he concluded the law provided no relief from "the unfairness of the situation," although he felt that the refusal of the Department of Human Services to return the child before adoption had been affected was outrageous.

Patricia appeals from the circuit court's decision, seeking reversal on the grounds that the circuit court misconstrued the applicable law of duress and, in the alternative, that the irrevocable provision of the statute was unconstitutional and a denial of her due process rights.

West Virginia Code § 48–4–5 (1986) provides the standards that must be met before a natural parent can relinquish legal custody of a child. In part, W.Va.Code § 48–4–5 provides:

(a) Parental consent or relinquishment of legal custody for adoption purposes, whether given by an adult or minor, is irrevocable from the time of execution, except where a court of competent jurisdiction finds that, notwithstanding the terms of the consent or relinquishment, such consent or relinquishment was obtained by fraud or duress, if:

(1) The consent or relinquishment is executed after the expiration of seventy-two hours after the birth of the child, and the consent so states;

(2) The parent executing the consent or relinquishment is informed that the consent is irrevocable from the time executed, and the consent so states;

(3) The consent or relinquishment includes a statement that the parent executing the consent does so of his own free will, that the consent was not obtained through fraud or duress, that the parent executing the consent believes the adoption of the child to be in the best interests of the child, expressly waives notice of any adoption proceeding to be filed, and joins in the petition to be filed and the prayer that the child be adopted; and

\* \* \* \* \* \*

(b) Any parental consent or relinquishment of legal custody for adoption pur-

poses which does not conform to the requirements of subsection (a) of this section may be revoked by such parent within ten days after the consent is executed and, whether given by an adult or a minor, is irrevocable thereafter except where a court of competent jurisdiction finds that such consent or relinquishment for adoption was obtained by fraud or duress.

\* \* \* \* \* \*

The statute clearly provides that a consent is irrevocable unless it can be proved that the consent was obtained by fraud or duress. Consequently, we must first determine what constitutes duress sufficient to revoke a consent to relinquishment.

This Court specifically addressed the issue of duress in *Wooten v. Wallace*, 177 W.Va. 159, 351 S.E.2d 72 (1986). "The term 'duress,' as used in *W.Va.Code*, 48–4–1a [1965], should be narrowly construed." *Id.* at syllabus point 1. The Court quoted with approval *Barwin v. Reidy*, 62 N.M. 183, 307 P.2d 175 (1957), in which the New Mexico Supreme Court commented that " '[i]f consents to adoption were ineffective every time this sort of duress entered the picture, it is difficult to see how any adoption where consent is required could be allowed to stand, for what natural parent would ever consent to the adoption of his or her child in the absence of duress of circumstances?' 62 N.M. at 197, 307 P.2d at 185." 351 S.E.2d at 74.

Although sympathetic with the natural parent's position, the *Wooten* Court concluded that to expand the definition of duress would undermine the security of the adoption process:

Furthermore, if we were to give to the word "duress" . . . the type of expansive definition that Mrs. Wooten urges, we would undermine the extent to which adopting parents could rely on consents to adopt. The natural parents could then challenge otherwise valid adoptions after the personal circumstances that compelled them to place the child up for adoption had passed.

*Id.* 177 W.Va. at 162, 351 S.E.2d at 75.[3] Consequently, we concur in the conclusion that the term duress "means a condition that exists when a natural parent is induced by the unlawful or unconscionable act of another to consent to the adoption of his or her child. Mere 'duress of circumstance' does not constitute duress under *W.Va.Code,* 48–4–1a [1965]." *Id.* at syllabus point 2.

The standard expressed in *Wooten* is equally applicable to the present case. We must agree with the findings of the trial court that no fraud or duress occurred sufficient to revoke the consent to relinquishment.[4] The appellant complains that although she signed a foster care form within seventy-two hours, she was not given the actual relinquishment form to sign until after the seventy-two hour period had passed, so that she no longer had the ten-day period in which to change her mind. The appellant, however, was unable to present any evidence that the appellees intended to keep the adoption form until after seventy-two hours had passed in order to deprive her of the opportunity to change her mind. More significant, perhaps, is the fact that the day after the child was born, Patricia signed a foster care form explaining that she was requesting foster care placement because she was unsure of her decision whether to keep or relinquish her rights to the child and apparently needed time to make a final decision. Consequently, it appears that she was incapable, within the seventy-two hour period, of deciding whether to keep the child. As illustrated by this situation, it is apparent that the legislative policy behind the seventy-two hour period was to provide the natural parent some protection against a too hurried decision to relinquish her child at a time when the physical and/or emotional stress of childbirth might limit or impair the parent's normal reasoning ability.[5]

In *Wooten,* this Court held that duress of circumstances was not sufficient to revoke a consent to relinquishment. Patricia alleges that her duress was more than that of the circumstances, pointing out that she was crying and upset when she signed the papers and that both she and her mother thought she had ten days in which to retrieve the child. However, the lower court found, and we must agree, that there is no evidence that Patricia was induced to sign the form or that she suffered from inability to comprehend the actions she was taking.

From our review of the transcript, it appears that if there was a misunderstanding, it stems primarily from both Patricia's and her mother's failure to listen to Ms. Velas when she explained the relinquishment papers. Our opinion is bolstered by inconsistencies in the appellant's testimony claiming that she was so upset that she did not understand what she was doing. At one point Patricia testified that she was crying because she was upset and didn't really pay attention to what Ms. Velas was explaining, although she did not ask Ms. Velas to stop or repeat herself. Similarly, Patricia's mother testified that she did not listen when Ms. Velas read the form, stating that "I didn't pay no attention to no form or anything." Conversely, however, when questioned at trial about her state of mind at the time she signed the relinquishment papers, Patricia responded:

Q. Why were you crying then? Why did you start to cry then?

A. My baby.

Q. What about your baby?

---

3. As *Wooten* was decided on November 26, 1986, substantially after the 1985 amendments to W.Va.Code § 48–4–1 *et seq., Wooten* is applicable in identifying the duress in this situation.

4. It is well established that the findings of a trial court will be overturned only when "plainly wrong," "against the preponderance of the evidence," or if "not supported by the evidence." Syl. pt. 8, *Bluefield Supply Co. v. Frankel's Appliances, Inc.,* 149 W.Va. 622, 142 S.E.2d 898 (1965).

5. The appellant asserts that the signing of the foster care form within the seventy-two hour period presented the possibility that it could be a standard practice in order to lure the natural mother into signing the relinquishment form outside the seventy-two hour period. This would deprive the natural mother of her right of revocation. The record does not establish such a practice. The foster care form can be viewed as a means of supplying some interim care assistance to the mother for the baby in order to give her time to consider her options.

A. For one thing, I was excited.

Q. You were crying from happiness because you had the baby?

A. Yes.

Q. You were happy when you went there with Lori?

A. Yes.

Q. You started to review these papers. Did you tell her I don't want to talk about these papers now?

A. No, I didn't tell her.

Q. Did you let her read the papers to you?

A. When I was crying, yes.

In further contrast is the testimony of the notary public who witnessed the signature on the relinquishment form. The notary, an uninterested hospital employee, testified that Patricia's mother, who was present when Patricia signed the forms, told her, "I think she is doing what's best." She also testified that Patricia seemed upset and hesitant to sign the papers, which is at odds with Patricia's own testimony that she signed the papers without realizing what she had signed, thinking she had ten days to get the child back.

After reviewing the entire record, we cannot help but believe that this situation is exactly what we had envisioned in *Wooten.* Regardless of whether Patricia's mood at that moment was happy or sad, it would be an unusual parent who was not affected emotionally by the act of giving up a child. Patricia's belief that she had ten days to

retrieve the child appears to stem from a lack of attention on her part, and the resulting misunderstanding over the foster care agreement was not the result of any manipulation by the appellees. Any duress that existed was that of circumstances rather than fraud or manipulation. Consequently, since we cannot find anything greater than duress of circumstances, we must, therefore, affirm the Ohio County Circuit Court's ruling.[6]

While the law is clear on this issue, the expression of our reasoning is more difficult. We cannot help but sympathize with the pain Patricia must feel as she regrets her original decision. Yet, in reaching this decision, we recognize that the finite boundaries of our purpose as a judicial body lie in defining the legal duty owed by the Department of Human Services.

Equally important is the basic premise that there must be finality in the adoption process if a successful adoption of a child is ever to occur. As we pointed out in *Wooten,* "no normal couple would undertake to adopt a child and risk establishing the supreme ties of affection and concern that exist between parents and child if they were in constant jeopardy of having their child ripped from their arms by a returning natural parent." 177 W.Va. at 162, 351 S.E.2d at 75.

Finally, we must emphasize that, as always, our primary concern is the best interest of the child.[7] Given the facts surrounding this case, as well as the law, we believe that the consent to relinquishment must

---

**6.** The appellant also alleges that W.Va.Code § 48–4–5 (1986) is unconstitutional as it denies Patricia her right to substantive due process in violation of art. III, § 10, of the West Virginia Constitution, citing *In re Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1973) and *Thorne v. Roush,* 164 W.Va. 165, 261 S.E.2d 72 (1979). Specifically, the appellant complains that because there is no waiting or "cooling off" period following a relinquishment which occurs seventy-two or more hours after the birth of the child, the statute is arbitrary and does not bear a rational relationship to the legislative purpose.

However, the cases cited by the appellant involve procedural due process issues, as in *Roush,* which dealt with the procedural aspects of barber apprenticeships and *Willis,* which con-

cerned the procedural due process aspects of terminating parental rights due to abuse and neglect. We find no procedural due process issue in the present case, as Patricia waived any right to procedural due process when she voluntarily relinquished custody. Moreover, the appellant cites no support for her theory of a substantive due process violation, a nebulous concept even under the best of circumstances, where the termination of parental rights was due to a voluntary relinquishment of custody. Thus, we decline to address the issue of the constitutionality of W.Va.Code § 48–4–5 (1986).

**7.** *See In re Custody of Cottrill,* 176 W.Va. 529, 346 S.E.2d 47 (1986); *Davis v. Hadox,* 145 W.Va. 233, 114 S.E.2d 468 (1960).

stand. Accordingly, the opinion of the Ohio County Circuit Court is affirmed.

Affirmed.