654 S.E.2d 373

**In re CESAR L.**

No. 33317.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 19, 2007.

Decided Oct. 25, 2007.

[redacted]

Robert Barrat, Martinsburg, West Virginia, for the Appellant, Tameka L.

Margaret B. Gordon, Berkeley Springs, West Virginia, Guardian ad Litem for the Minor Child, Cesar L.

Christopher C. Quasebarth, Chief Deputy Prosecuting Attorney, Martinsburg, West Virginia, for the Appellee, West Virginia Department of Health and Human Resources.

DAVIS, Chief Justice:

The appellant herein and respondent below, Tameka L.M.L.[1] [hereinafter "Tameka" or "mother"], appeals from orders entered October 11, 2006, and December 14, 2006, by the Circuit Court of Berkeley County. By order entered October 11, 2006, the circuit court determined that the mother does not have standing to request a modification of the minor child's, Cesar L.'s [hereinafter "Cesar"], disposition in accordance with W. Va.Code § 49-6-6 (1977) (Repl.Vol.2004)[2] because she had voluntarily relinquished her parental rights and, thus, was no longer Cesar's parent. In response to this ruling, Tameka then sought to withdraw her earlier relinquishment. By order entered December 14, 2006, the circuit court found that Tameka's relinquishment was voluntary and free of fraud and duress and, accordingly, that it was a valid voluntary relinquishment pursuant to W. Va.Code § 49-6-7 (1977) (Repl.Vol. 2004).[3] On appeal to this Court, Tameka claims that the circuit court erred by finding

that she does not have standing to request a modification in Cesar's disposition and by refusing to set aside her voluntary relinquishment. Upon a review of the parties' arguments, the record of this matter, and the pertinent authorities, we affirm the October 11, 2006, and December 14, 2006, orders of the Berkeley County Circuit Court.

## I.

## FACTUAL AND PROCEDURAL HISTORY

This case began on February 23, 2005, with the birth of Cesar L. to his mother, Tameka. Shortly thereafter, on March 3, 2005, the appellee herein and petitioner below, the West Virginia Department of Health and Human Resources [hereinafter "the DHHR"], filed an emergency petition requesting that Cesar's care and custody be immediately transferred to the DHHR because the DHHR believed Cesar to be in danger insofar as Tameka's rights to three older children had been involuntarily terminated.[4] The circuit court awarded the DHHR the temporary care and custody of Cesar by order entered March 3, 2005. The DHHR, in June 2005, placed Cesar in his aunt's care and custody.[5]

1. In light of the sensitive nature of the facts at issue in this proceeding, we follow our prior practice in similar cases and refer to the parties by their last initials. *See In re Clifford K.*, 217 W.Va. 625, 630, n. 1, 619 S.E.2d 138, 143 n. 1 (2005), and cases cited therein.

2. W. Va.Code § 49-6-6 (1977) (Repl.Vol.2004) directs that,

[u]pon motion of a child, a child's parent or custodian or the state department alleging a change of circumstances requiring a different disposition, the court shall conduct a hearing pursuant to section two [§ 49-6-2] of this article and may modify a dispositional order: Provided, that a dispositional order pursuant to subdivision (6), subsection (a) of section five [§ 49-6-5(a)(6)] shall not be modified after the child has been adopted. Adequate and timely notice of any motion for modification shall be given to the child's counsel, counsel for the child's parent or custodian and to the state department.

3. Pursuant to W. Va.Code § 49-6-7 (1977) (Repl. Vol.2004), "[a]n agreement of a natural parent in

termination of parental rights shall be valid if made by a duly acknowledged writing, and entered into under circumstances free from duress and fraud."

4. In its petition seeking the emergency temporary custody of Cesar, the DHHR enumerated various aggravated circumstances in this case, including the fact that the mother has had her parental rights involuntarily terminated as to three older children: her rights as to two children were involuntarily terminated on August 24, 2001, as a result of abandonment, and her rights as to a third child were involuntarily terminated on November 26, 2002, due to aggravated circumstances in the 2001 case and her incarceration on felony charges involving check forgery. The petition further averred that all three of these children were adopted by Tameka's parents, with whom she still resides, and that, as a result of her living conditions, she continues to have unsupervised access to all three of these children. Furthermore, the petition represented that Tameka had a fourth child, born in 2004, who died at the age of three months, presumably while co-sleeping in a twin-sized bunk bed with Tameka.

Subsequently, the DHHR filed an amended petition alleging that Cesar was an abused and/or neglected child based upon the fact that he tested positive for marijuana and amphetamines at the time of his birth and his mother, Tameka, tested positive for marijuana at the time of Cesar's birth.[6] Tameka filed an answer, admitting her drug abuse and stipulating that Cesar's case was an aggravated circumstances case.[7] By order entered May 25, 2005, Cesar was adjudicated to be an abused and neglected child.

Following the adjudicatory hearing, Tameka planned to enter a drug treatment program in Beckley, West Virginia. While she was checking into this facility, a routine background check revealed an outstanding warrant for Tameka's arrest had been issued by the State of Virginia.[8] As a result, Tameka was arrested and incarcerated in Virginia. The circuit court then continued to postpone Cesar's dispositional hearing until such time as Tameka was released from incarceration. Ultimately, on September 29, 2005, Tameka, while she was still incarcerated, signed a voluntary relinquishment of parental rights, which her counsel later filed with the circuit court.[9] During a hearing held on November 30, 2005, mother's counsel presented Tameka's voluntary relinquishment to the circuit court, and the circuit court accepted it after counsel represented that the relinquishment was voluntary. Counsel for mother also requested the court to permit Tameka to have post-termination visitation with Cesar, which motion was granted subject to Cesar's best interests and the discretion of Cesar's care giver, his aunt.

The circuit court conducted numerous other proceedings regarding Cesar, his continued thriving in his aunt's care, and the rights of his father. On June 19, 2006, Tameka, by new counsel, filed a motion pursuant to W. Va.Code § 49-6-6 requesting the circuit court to modify Cesar's disposition vis-a-vis her parental rights. In support of her request for relief, Tameka asserted that she had been released from incarceration and that she wished to be reunited with her son. The circuit court conducted a hearing on September 28, 2006, and issued its order with regard to mother's motion to modify disposition on October 11, 2006. In summary, the circuit court determined that because Tameka had voluntarily relinquished her parental rights to Cesar, she did not have standing to request a modification of his disposition insofar as W. Va.Code § 49-6-6 plainly states that the only persons that may make such a motion are "a child, a child's parent or custodian or the state department." The circuit court did, however, suggest that Tameka could file a motion, in accordance with W. Va.Code § 49-6-7, to withdraw her voluntary relinquishment and that if her parental rights were reinstated, she could then request a modification of Cesar's disposition.

Tameka then filed an affidavit, on October 11, 2006, alleging that her relinquishment was not voluntary but had been obtained under duress during her incarceration in Virginia.[10] In further support of her affidavit, Tameka claimed that her attorney had not explained the ramifications of the voluntary

---

**5.** The record indicates that Tameka selected this relative placement for Cesar, and that this aunt has passed a home study and is presently a possible permanent placement for Cesar pending the conclusion of the underlying abuse and neglect proceedings.

**6.** The DHHR also filed a second amended petition wherein it raised abuse and neglect allegations against Cesar's father, Luis A.L. Although the circuit court in the underlying proceedings has also made various determinations as to the status of Luis's rights vis-a-vis Cesar, such rulings have been raised in a separate petition for appeal and are not at issue in the instant proceeding.

**7.** *See supra* note 4.

**8.** Tameka earlier had been incarcerated in the State of Virginia on felony charges involving check forgery. *See supra* note 4. Although she had served the time for that crime, she failed to pay the accompanying $50 fine. Her nonpayment constituted a parole violation, and, thus, the warrant for her arrest was issued.

**9.** See note 22, *infra*, for the language of Tameka's voluntary relinquishment of her parental rights to Cesar.

**10.** For the text of Tameka's affidavit, see *infra* note 23.

relinquishment to her and that she had been led to believe that her parental rights would be terminated if she did not sign the relinquishment form. Following a hearing on this motion, the circuit court, by order entered December 14, 2006, concluded that Tameka was not subject to fraud or duress when she signed her voluntary relinquishment and denied Tameka's motion to withdraw her relinquishment. From the orders entered October 11, 2006, and December 14, 2006, Tameka now appeals[11] to this Court.

## II.

## STANDARD OF REVIEW

■ The instant appeal arose in the context of an abuse and neglect proceeding. When reviewing rulings rendered by a lower court in the abuse and neglect context, we consider carefully the various components of the court's ruling, according deference where warranted and reviewing *de novo* legal interpretations.

Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused and neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. pt. 1, *In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996). In the case *sub judice*, the circuit court interpreted two different statutes, W. Va.Code §§ 49-6-6 and 49-6-7, and applied those interpretations to the facts before it. We previously have held that "[i]nterpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syl. pt. 1, *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W.Va. 573, 466 S.E.2d 424 (1995). *Accord* Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."). Guided by these standards of review, we proceed to consider the mother's assignments of error.

## III.

## DISCUSSION

On appeal to this Court, Tameka assigns error to the circuit court's rulings finding that she lacked standing to request a change of Cesar's disposition in accordance with W. Va.Code § 49-6-6 and refusing to set aside her voluntary relinquishment of her parental rights pursuant to W. Va.Code § 49-6-7. We will address each of these assignments in turn.

*A. Standing pursuant to W.Va.Code § 49-6-6 (Order of October 11, 2006)*

Tameka first assigns error to the circuit court's finding that she does not have standing to move for a modification of Cesar's disposition in accordance with W. Va.Code

---

**11.** Tameka's petition for appeal was filed on December 12, 2006, and indicated that it was an appeal from an order "to be entered, [and] also" an order entered "Oct[.] 11, 2006." The circuit court entered its order denying Tameka relief pursuant to W. Va.Code § 49-6-7 on December 14, 2006. Insofar as the appellee herein, the DHHR, has conceded that Tameka is appealing from both orders and has fully briefed Tameka's arguments relating to both orders, we find there is no procedural barrier to considering Tameka's assignments of error as to both orders on appeal to this Court. *See* Syl. pt. 3, *State v. Salmons*, 203 W.Va. 561, 509 S.E.2d 842 (1998) ("When a defendant assigns an error in a criminal case for the first time on direct appeal, the state does not object to the assignment of error and actually briefs the matter, and the record is adequately developed on the issue, this Court may, in its discretion, review the merits of the assignment of error.").

§ 49–6–6 (1977) (Repl.Vol.2004). By order entered October 11, 2006, the circuit court ruled that because Tameka had voluntarily relinquished her parental rights to Cesar, she was no longer Cesar's parent, and thus, she did not qualify as one of the enumerated individuals who are statutorily permitted to move for a modification of disposition. *See* W. Va.Code § 49–6–6.

Before this Court, Tameka argues that the circuit court erred by finding that she does not have standing to request a modification of Cesar's disposition. In support of her argument, Tameka suggests that W. Va. Code § 49–6–6 and W. Va.Code § 49–6–7 should be read independently of one another to permit parents who have voluntarily relinquished their parental rights to request modification of their children's dispositional orders. Otherwise, Tameka argues, the circuit court's application of W. Va.Code § 49–6–7 completely eradicates any rights she has as Cesar's parent to request relief pursuant to W. Va.Code § 49–6–6.

Likewise, the DHHR substantially agrees with Tameka's contention that the circuit court erred by finding that she does not have standing to move for modification under W. Va.Code § 49–6–6. In this regard, the DHHR claims that such an interpretation of W. Va.Code § 49–6–6 creates a procedural barrier to the permanency of children whose parents' rights have been terminated by voluntary relinquishment because those parents must prove that their relinquishments were obtained by fraud or duress before they can move for modification to demonstrate a change in circumstances and be reunited with their children.

By contrast, Cesar's Guardian ad Litem [hereinafter "the Guardian"] urges this Court to affirm the circuit court's ruling because when Tameka voluntarily relinquished her parental rights, her legal status as Cesar's parent was terminated. The Guardian further contends that it is not fair to a child to permit a parent to try to undo his/her voluntary relinquishment to seek to re-enter the child's life when that parent is virtually a stranger to the child. Moreover, the Guardian asserts that permitting a parent under these circumstances standing to request a modification of disposition also unnecessarily delays the child's permanent placement.

1. **W. Va.Code § 49–6–6.** At issue in this assignment of error is the language of W. Va.Code § 49–6–6 and its application to the facts of this case. The portion [12] of W. Va.Code § 49–6–6 that is relevant to these proceedings permits

> [u]pon motion of a child, a child's parent or custodian or the state department [13] alleging a change of circumstances requiring a different disposition, the court shall conduct a hearing pursuant to section two [§ 49–6–2] of this article and may modify a dispositional order: Provided, That a dispositional order pursuant to subdivision (6), subsection (a) of section five [§ 49–6–5(a)(6)] shall not be modified after the child has been adopted . . . .

(Footnote added). In order to assess the correctness of the circuit court's ruling regarding this section, however, we first must consider the language of the statute, itself.

■ We previously have held that "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975). When examining the text of a statutory provision, language that is plain need not be construed before it is applied to the facts of the case. "A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syl. pt. 2, *State v. Epperly*, 135 W.Va. 877, 65 S.E.2d 488 (1951). *But see* Syl. pt. 1, *Farley v. Buckalew*, 186 W.Va. 693, 414 S.E.2d 454 (1992) ("A statute that is ambiguous must be construed before it can be applied.").

---

**12.** For the full text of W. Va.Code § 49–6–6, see *supra* note 2.

**13.** For purposes of the child welfare statutes, of which W. Va.Code § 49–6–6 is a part, "state department" refers to "the state department of health and human resources." W. Va.Code § 49–1–4(5) (1998) (Repl.Vol.2004).

■ Nevertheless, where the Legislature has failed to provide a statutory definition for a word used in one of its enactments, the common, ordinary meaning of the word is relied upon to give meaning to the statute. "Generally the words of a statute are to be given their ordinary and familiar significance and meaning, and regard is to be had for their general and proper use." Syl. pt. 4, *State v. General Daniel Morgan Post No. 548, V.F.W.*, 144 W.Va. 137, 107 S.E.2d 353 (1959). In other words, "[i]n the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." Syl. pt. 1, *Miners in Gen. Group v. Hix*, 123 W.Va. 637, 17 S.E.2d 810 (1941), *overruled on other grounds by Lee–Norse Co. v. Rutledge*, 170 W.Va. 162, 291 S.E.2d 477 (1982).

■ Applying these tenets of statutory construction to the legislative enactment at issue herein, W. Va.Code § 49–6–6, we find the language of this provision to be facially plain. Therefore, we hold that the plain language of W. Va.Code § 49–6–6 (1977) (Repl.Vol.2004) permits a child, a child's parent or custodian, or the West Virginia Department of Health and Human Resources [14] to move for a modification of the child's disposition where a change of circumstances warrants such a modification. However, a child's disposition may not be modified after he/she has been adopted. Although this statutory language is plain, the parties dispute the precise meaning of the word "parent" employed therein. Therefore, we must determine whether a person who has voluntarily relinquished his/her parental rights retains his/her status as a "parent" for purposes of W. Va.Code § 49–6–6.[15]

2. **Definition of "parent."** While the Legislature has not defined the word "par-

ent" in the specific child welfare statutes encompassing W. Va.Code § 49–6–6, the Legislature has provided a definition for the word "parent" in the statutes criminalizing child abuse. In the criminal law context, " '[p]arent' means the biological father or mother of a child, or the adoptive mother or father of a child." W. Va.Code § 61–8D–1(7) (1988) (Repl.Vol.2000).[16] This definition is particularly instructive insofar as it is part of the general body of law concerning the abuse and neglect of minor children. *See* Syl. pt. 5, in part, *Fruehauf Corp. v. Huntington Moving & Storage Co.*, 159 W.Va. 14, 217 S.E.2d 907 (1975) ("Statutes which relate to the same persons or things, or to the same class of persons or things, or statutes which have a common purpose will be regarded in *pari materia* to assure recognition and implementation of the legislative intent."). *See also* Syl. pt. 3, *Smith v. State Workmen's Comp. Comm'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975) ("Statutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments.").

Similarly, this Court has defined the term "parent" in Rule 3(j) of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings: " '[p]arent' or 'parents' means the child's natural parent(s), custodian(s), or legal guardian(s)." This definition also is instructive to our decision herein because the Rules of Procedure for Child Abuse and Neglect Proceedings are intended to provide guidance in the absence of other authority or in the presence of conflicting authority. *See* W. Va. R. Proc. for Child Abuse & Neglect Proceed. 1 ("These rules set forth procedures for circuit courts in child abuse and neglect proceedings instituted pursuant to W. Va.Code § 49–6–1, *et seq.* If these rules conflict with other rules or statutes, these rules shall apply.").

---

**14.** *See supra* note 13.

**15.** Insofar as the facts of the case *sub judice* involve Tameka's voluntary relinquishment of her parental rights, as opposed to the involuntary termination thereof, we will limit our discussion herein to voluntary relinquishments of parental rights.

**16.** Following the institution of the instant proceedings, the Legislature amended W. Va.Code § 61–8D–1 (1988) (Repl.Vol.2000), however the definition of "parent" was not affected by these changes. *See* W. Va.Code § 61–8D–1(7) (2005) (Repl.Vol.2005).

Reconciling the legislative definition of "parent" in W. Va.Code § 61–8D–1(7) with the definition of "parent" contained in Rule 3(j) of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, we find the discrete differences between these two definitions to be distinctions without a difference. Accordingly, we hold that, for purposes of W. Va.Code § 49–6–6 (1977) (Repl.Vol.2004), "parent" means the biological or natural father or mother of a child; the adoptive father or mother of a child; or the legal guardian of a child.[17]

**3. Effect of voluntary relinquishment of parental rights.** The question remains, however, whether a parent who has voluntarily relinquished his/her parental rights retains his/her status as a "parent" after such relinquishment. W. Va.Code § 49–6–7 (1977) (Repl.Vol.2004) sets forth the procedure a parent must follow in order to voluntarily relinquish his/her parental rights: "[a]n agreement of a natural parent in termination of parental rights shall be valid if made by a duly acknowledged writing, and entered into under circumstances free from duress and fraud." Applying the tenets of statutory construction discussed above, we find this statute also to be plain and in need of no further construction to understand its terms. Therefore, we hold that W. Va.Code § 49–6–7 (1977) (Repl.Vol.2004) permits a parent to voluntarily relinquish his/her parental rights. Such voluntary relinquishment is valid pursuant to W. Va.Code § 49–6–7 if the relinquishment is made by "a duly acknowledged writing" and is "entered into under circumstances free from duress and fraud." What this statute does not address, though, is whether, by virtue of a voluntary relinquishment of parental rights, the parent loses his/her status as the child's parent. The resolution of this query is critical to determining whether Tameka has standing to move for a modification of Cesar's disposition under W. Va.Code § 49–6–6.

The revocation of a parent's parental rights, whether by voluntary relinquishment or by involuntary termination, is a very serious matter. By definition, "parental rights" encompasses "any and all rights and duties regarding a parent to a minor child, including, but not limited to, custodial rights and visitational rights and *rights to participate in the decisions affecting a minor child.*" W. Va.Code § 49–1–3(*o*) (1999) (Repl.Vol.2004) (emphasis added).[18] As to the importance and sanctity of parental rights, we frequently have observed that "[n]othing is more sacred or scrupulously safeguarded as a parent's right to the custody of his/her child." *In re Clifford K.,* 217 W.Va. 625, 644, 619 S.E.2d 138, 157 (2005). *Accord* Syl. pt. 1, *In re Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1973) ("In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions."); Syl. pt. 1, *Whiteman v. Robinson,* 145 W.Va. 685, 116 S.E.2d 691 (1960) ("A parent has the natural right to the custody of his or her infant child, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment or other dereliction of duty, or has waived such right, or by agreement or otherwise has transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts.").

For this reason, the decision to end a parent's parental rights is not one that is made lightly, and this process of ending a parent's parental rights is guided by many stringent rules and regulations to protect the rights of both the parent and his/her child. *See generally* W. Va.Code § 49–6–1, *et seq.* (outlining procedure to be followed in child abuse and neglect cases); W. Va. R. Proc. for Child Abuse & Neglect Proceed. 1, *et seq.* (providing further guidelines to be followed

---

**17.** It goes without saying that the definition of "parent" in W. Va.Code § 49–6–6 does not also encompass "custodian," as contemplated by Rule 3(j), insofar as § 49–6–6 distinguishes between "a child's parent or custodian."

**18.** This section has since been recodified, but the definition of "parental rights" was not changed. *See* W. Va.Code § 49–1–3(q) (2007) (Supp.2007).

in abuse and neglect proceedings). *See also* Syl. pt. 7, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996) (" ' "Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, *W.Va.Code*, 49–6–5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under *W. Va.Code*, 49–6–5(b) [1977] that conditions of neglect or abuse can be substantially corrected." Syllabus Point 2, *In re R.J.M*, 164 W.Va. 496, 266 S.E.2d 114 (1980). Syllabus point 4, *In re Jonathan P.*, 182 W.Va. 302, 387 S.E.2d 537 (1989).' Syllabus Point 1, *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993).").

Be that as it may, once a determination, whether voluntary or involuntary, has been made to revoke a parent's parental rights, we must accept the weighty considerations accompanying that decision and may overturn that ruling only if warranted.[19] *See* W. Va. Code § 49–6–7 (permitting rescission of voluntary relinquishment of parental rights where such relinquishment was obtained by fraud or duress); Syl. pt. 1, *In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (delineating standard of review of circuit court orders in abuse and neglect proceedings).

Despite the importance of a parent's parental rights, in cases involving the relinquishment or termination of parental rights, the paramount concern remains the best interests of the children involved therein. "Although parents have substantial rights that must be protected, the primary goal ... must be the health and welfare of the children." Syl. pt. 3, in part, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589. *Accord State ex rel Roy Allen S. v. Stone*, 196 W.Va. 624, 638, 474 S.E.2d 554, 568 (1996) ("Although a parent has a protectable interest in a child, a parent's rights are not absolute: the welfare of the child is the paramount consideration to which all of the factors, including common law preferential rights of the parents, must be deferred or subordinated." (internal quo-

tations and citations omitted)). Ensuring finality for these children is vital to safeguarding their best interests so that they may have permanency and not be continually shuttled from placement to placement. *See Syl.pt.* 1, in part, *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991) ("Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security.").

◼ Consequently, we typically have considered a termination or relinquishment of parental rights as achieving such finality through the cessation of that particular parent-child relationship, which then facilitates the child's permanent placement and/or adoption. In this regard, we previously have stated that "[w]hen an individual's parental rights have been terminated the law no longer recognizes such individual as a 'parent' with regard to the child or children involved in the particular termination proceeding." *Elmer Jimmy S. v. Kenneth B.*, 199 W.Va. 263, 268, 483 S.E.2d 846, 851 (1997). In light of our prior recognition of the effect of the revocation of a person's parental rights, we now hold that a final order terminating a person's parental rights, as the result of either an involuntary termination or a voluntary relinquishment of parental rights, completely severs the parent-child relationship, and, as a consequence of such order of termination, the law no longer recognizes such person as a "parent" with regard to the child(ren) involved in the particular termination proceeding.

◼ Thus, barring some egregious circumstances that would justify reinstating the person's parental rights, an involuntary termination or a voluntary relinquishment of parental rights permanently severs the parent-child relationship and relieves such person of all the rights and privileges, as well as duties and obligations, considered to be "parental rights," W. Va.Code § 49–1–3(*o*) (1999). *See* W. Va.Code § 49–6–7 (invalidating voluntary relinquishment of parental

---

**19.** In this case, in fact, Tameka has asked the lower court for leave to withdraw her voluntary relinquishment of parental rights. We will address the circuit court's denial of Tameka's request and her assignment of error in this regard in Section III.B., *infra*.

rights obtained by fraud or duress); Syl. pt. I, *In re Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (limiting reversal of abuse and neglect rulings by a lower court to those decisions that are "clearly erroneous"). As a result, the person who formerly possessed such parental rights loses his/her status as the child's parent. Accordingly, we hold that a valid voluntary relinquishment of parental rights, effectuated in accordance with W. Va. Code § 49–6–7 (1977) (Repl.Vol.2004), includes a relinquishment of "rights to participate in the decisions affecting a minor child," W. Va.Code § 49–1–3(*o*) (1999) (Repl.Vol. 2004), and causes the person relinquishing his/her parental rights to lose his/her status as a parent of that child. We hold further that a person whose parental rights have been terminated by a final order, as the result of either an involuntary termination or a voluntary relinquishment of parental rights, does not have standing as a "parent," pursuant to W. Va.Code § 49–6–6 (1977)

(Repl.Vol.2004), to move for a modification of disposition of the child with respect to whom his/her parental rights have been terminated.[20] Applying these holdings to the facts presently before us, we conclude that the circuit court did not err by ruling that Tameka does not have standing as a parent to request a modification of Cesar's disposition in accordance with W. Va.Code § 49–6–6 because, by virtue of her voluntary relinquishment of her parental rights to Cesar, Tameka is no longer considered to be his parent.[21] Thus, the October 11, 2006, order of the Circuit Court of Berkeley County is affirmed.

### B. Voluntariness of Relinquishment pursuant to W. Va.Code § 49–6–7 (Order of December 14, 2006)

Tameka also assigns error to the circuit court's ruling finding her voluntary relinquishment of parental rights[22] to be valid.

20. Before this Court, the DHHR contends that this Court previously has permitted a person whose parental rights were involuntarily terminated to move for modification of disposition pursuant to W. Va.Code § 49–6–6 and that such a ruling would be inconsistent with a finding that Tameka lacks standing as a parent. *Citing* Syl. pt. 8, *In re Stephen Tyler R.*, 213 W.Va. 725, 584 S.E.2d 581 (2003) ("A circuit court may, in the course of modifying a previously-entered dispositional order in an abuse and neglect case in accordance with W. Va.Code § 49–6–6 (1977) (Repl.Vol.2001), amend a parent's continuing support obligation or the amount thereof. The court may not, however, modify said dispositional order to cancel accrued child support or decretal judgments resulting from child support arrearages."). Such a construction is not accurate, however, and the Guardian correctly recognizes that the modification of disposition permitted by the *Stephen* case was limited solely to a modification of child support. Moreover, W. Va. Code § 48–11–105 (2001) (Repl.Vol.2004) permits a party to move for modification of child support at any time there exists a "substantial change in circumstances."

21. In their arguments to this Court, the parties, namely Tameka and the DHHR, have expressed concern that if a person who has relinquished his/her parental rights does not have standing to move for a modification of disposition under W. Va.Code § 49–6–6, then persons who have substantially corrected the conditions of abuse and neglect would never be able to present evidence of such improvement to the court. Without reiterating the limited circumstances under which a voluntary relinquishment of parental rights may be invalidated, it suffices to say that this opinion

does not preclude any of the other persons permitted by W. Va.Code § 49–6–6 to request a change in the child's disposition from doing so if the relinquished parent's improved circumstances are such that they constitute "a change of circumstances" thereunder, and, as required by W. Va.Code § 49–6–6, such motion is made before the child has been adopted.

22. The text of Tameka's voluntary relinquishment of her parental rights to Cesar provides:

**RELINQUISHMENT OF PARENTAL RIGHTS BY MOTHER[;] REQUEST FOR POST–RELINQUISHMENT VISITATION**

I, Tameka M[.]-L[.], the Respondent Mother of Cesar A[.] L[.], date of birth February 23, 2005, after thoughtful consideration of this matter, hereby acknowledge the following:

1. That I believe it is in the best interest of Cesar A[.] L[.] to remain in the custody of the West Virginia Department of Health and Human Resources;

2. I understand that I am entitled to be represented by counsel at all proceedings.

3. Heidi J. Myers has been appointed by this Honorable Court to represent my interests at these hearings.

4. I understand that I would be entitled to call witnesses, present evidence, testify on my own behalf, and have my attorney cross-examine any witnesses called at any hearing held in this matter;

5. I wish to waive my right to an adjudication and dispositional hearing in this matter and voluntarily relinquish all my parental rights to Cesar A[.] L[.]

6. I understand the Court would consider less drastic alternatives to termination, such as grant-

In its order of October 11, 2006, denying Tameka standing to move for a modification of Cesar's disposition because she earlier had relinquished her parental rights to this child, the circuit court indicated that if Tameka sought relief from her voluntary relinquishment, her parental rights potentially could be restored at which time she then would have standing to request that Cesar's disposition be modified. Pursuant to this order, Tameka filed an affidavit [23] seeking to withdraw her voluntary relinquishment of parental rights. Thereafter, the circuit court, by order entered December 14, 2006, found that Tameka had not presented evidence sufficient to warrant an evidentiary hearing on her motion and denied the same, determining that Tameka's relinquishment was valid and had not been obtained by fraud or duress.

On appeal to this Court, Tameka complains that the circuit court erred by not affording her an evidentiary hearing and by refusing to set aside her relinquishment. In this regard, Tameka asserts that the circuit court should have permitted her to present evidence in a hearing before the court to prove that her relinquishment had been obtained under duress. As to her claim of duress, Tameka states that she was incarcerated at the time of her relinquishment and claims that although she was represented by an attorney at that time, she did not receive the advice of counsel prior to executing the relinquishment. The DHHR and the Guardian respond by urging this Court to affirm the circuit court's ruling insofar as Tameka failed to prove that her voluntary relinquishment of her parental rights had been obtained by fraud or duress as required by W. Va.Code § 49–6–7 to invalidate an otherwise valid relinquishment.

The statute which permits a parent to voluntarily relinquish his/her parental rights and provides guidance as to when such a relinquishment should be invalidated is W. Va.Code § 49–6–7 (1977) (Repl.Vol.2004). As

---

ing a pre or post adjudicatory improvement period, returning the child into my custody or simply having custody remain with West Virginia Department of Health and Human Resources.

7. I fully understand the consequences of this decision. I understand my decision will result in the termination of my parental rights as to Cesar A[.] L[.]

8. I understand that I have no right to custody or visitation in this matter, but request at this time that visitation be afforded to me in the future.

9. I understand that I will have no right to participate in the care, custody, control, education, training or any aspect of raising Cesar A[.] L[.] from this point forward.

10. I understand by relinquishing parental rights to Cesar A[.] L[.] that it is a final disposition as towards custody and therefore I leave the Court no less restrictive alternative or option other than termination of my parental rights.

11. I understand that I am authorizing West Virginia Department of Health and Human Resources to consent to the adoption of Cesar A[.] L[.], the right to change his name and I understand that I am waiving notice as to these proceedings.

12. I have read and discussed thoroughly with my attorney all the above-mentioned rights.

13. I fully understand the meaning and consequences of executing this document.

14. I have not been induced, coerced or threatened into signing this document.

15. No promises or rewards have been offered in consideration for my execution of this document.

I hereby freely, knowingly, intelligently and voluntarily relinquish all my parental rights to Cesar A[.] L[.]

This document was signed by "Tameka M[.] L[.]," notarized, and dated "September 29, 2005."

23. Tameka's affidavit states:

*AFFIDAVIT OF TAMEKA L[.] CONCERNING WVA CODE 49–6–7 RELINQUISHMENT OF PARENTAL RIGHTS*

Now comes Tameka L[.] L[.], and first being duly sworn, deposes and states the following:

1. That I relinquished my rights to my son Cesar L[.] under duress.

2. I was incarcerated at the time of any relinquishment in the State of Virginia.

3. That my attorney at the time Heidi Myers did not explain the relinquishment to me. I only spoke with her secretary once, and then a block was put on any further calls. Heidi Myers sent a form down for me to sign but no letter explaining it.

4. The secretary at the Myers Law Office informed me that if I did not relinquish I would be terminated from my son and then I could not get him back.

5. That it would be in the best interests of my child Cesar L[.] for the relinquishment to be set aside; that is the polar star to follow. I desire to be reunited with my son.

6. I am willing to testify further about this matter in Court and under oath.

And further you[r] affiant sayeth not.

Appearing at the end of this affidavit was the signature of "Tameka L[.] L[.]," the notarization, and the date of October 4, 2006.

we observed in the preceding section of this opinion, this statute provides that "[a]n agreement of a natural parent in termination of parental rights shall be valid if made by a duly acknowledged writing, and entered into under circumstances free from duress and fraud." *Id.* Having determined the language of this provision to be plain, we need only apply it to the facts presently before us.

## ■■■ 1. Hearing on motion to withdraw voluntary relinquishment.

Tameka first argues that the circuit court was required to permit her to present evidence, at a hearing before the court, to prove that she was improperly induced by fraud or duress to relinquish her parental rights to Cesar. We previously have addressed this issue and concluded that the decision to hold an evidentiary hearing rests within the court's sound discretion: "Under the provisions of *W.Va. Code*, 49-6-7, a circuit court *may* conduct a hearing to determine whether the signing by a parent of an agreement relinquishing parental rights was free from duress and fraud." Syl. pt. 3, *State ex rel Rose v. Pancake*, 209 W.Va. 188, 544 S.E.2d 403 (2001) (emphasis added). Moreover, the word "may" generally is afforded a permissive connotation, which renders the referenced act discretionary, rather than mandatory, in nature. *See State v. Hedrick*, 204 W.Va. 547, 552, 514 S.E.2d 397, 402 (1999) ("The word 'may' generally signifies permission and connotes discretion." (citations omitted)); *Gebr. Eickhoff Maschinenfabrik Und Eisengieberei mbH v. Starcher*, 174 W.Va. 618, 626 n. 12, 328 S.E.2d 492, 500 n. 12 (1985) ("An elementary principle of statutory construction is that the word 'may' is inherently permissive in nature and connotes discretion." (citations omitted)). Thus, the circuit court had discretion to permit Tameka an opportunity to present evidence at a hearing for that purpose or to consider, without a hearing, Tameka's motion to withdraw her relinquishment. Under the facts of this case, we find that the circuit court did not abuse its discretion by denying Tameka the evidentiary hearing she requested. As will be discussed more fully below, Tameka did not present any new evidence in her affidavit that would tend to indicate that her relinquishment had been obtained by fraud or duress to warrant further development during an evidentiary hearing.

## ■■■ 2. Proof of fraud or duress.

Tameka also challenges the circuit court's ruling upholding her relinquishment as valid because she had failed to prove that it had been obtained by fraud or duress as required by W. Va.Code § 49-6-7. We previously have observed that,

[w]hile *W.Va.Code*, 49-6-7 specifically permits a relinquishment of parental rights, it clearly suggests that such an agreement may be invalid if it is not entered into under circumstances that are free of duress and fraud. Whether there has been fraud or duress is a question of fact that must be determined by the circuit court judge.

*Rose*, 209 W.Va. at 191, 544 S.E.2d at 406.

To guide lower courts in making a determination as to whether or not a relinquishment should be invalidated, the elements needed to prove fraud or duress, as well as the requisite burden of proof therefor, were explained at length in the concurrence to *Rose:*

[A] relinquishment agreement that is made in writing and entered into under circumstances free from duress and fraud *is valid*. A parent attempting to show otherwise is faced with a challenging task. Indeed, the threshold for establishing duress and fraud in the context of the relinquishment of parental rights is extremely high. As to duress, this Court has held that, in the context of an adoption, duress "means a condition that exists when a natural parent is induced by the unlawful or unconscionable act of another to consent to the adoption of his or her child. Mere 'duress of circumstance' does not constitute duress[.]" Syl. pt. 2, in part, *Wooten v. Wallace*, 177 W.Va. 159, 351 S.E.2d 72 (1986). *See also Baby Boy R. v. Velas*, 182 W.Va. 182, 185, 386 S.E.2d 839, 842 (1989) ("[Duress] means a condition that exists when a natural parent is induced by the unlawful or unconscionable act of another to consent to the adoption of his or her child."). With respect to fraud, we have held:

The essential elements in an action for fraud are: (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied on it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied on it. Syl. pt. 1, *Lengyel v. Lint,* 167 W.Va. 272, 280 S.E.2d 66 (1981)....

Finally, I wish to emphasize that a parent challenging a relinquishment of his or her parental rights on the grounds of duress and fraud has the difficult responsibility of establishing the elements outlined above by *clear and convincing* evidence. *See, e.g.,* [W. Va.Code § ] 48-4-5(a)(2) (1997) (Repl.Vol.1999) (allowing revocation of adoption due to fraud or duress only where "[t]he person who executed the consent or relinquishment proves *by clear and convincing evidence* ... that the consent or relinquishment was obtained by *fraud or duress* " (emphasis added))....

[I]t is clear that a parent has a heavy burden to establish duress or fraud once he or she has relinquished parental rights....

*Rose,* 209 W.Va. at 192–93, 544 S.E.2d at 407–08 (Davis, J., concurring) (emphasis in original) (additional citations omitted).

Reviewing the contents of the affidavit by which Tameka sought to withdraw her relinquishment,[24] we agree with the circuit court's conclusion that she did not prove that she had been subject to fraud or duress at the time she relinquished her parental rights. Although we appreciate that, at the time she signed her voluntary relinquishment of her parental rights to Cesar, Tameka was incarcerated and thus not then able to care for her child, this simple fact, alone, is not sufficient to constitute duress. In this regard, we previously held that "[m]ere 'duress of circumstance' does not constitute duress." Syl. pt. 2, in part, *Wooten v. Wallace,* 177 W.Va. 159, 351 S.E.2d 72.

Neither are we convinced that Tameka's former counsel coerced her into relinquishing her parental rights. Of particular relevance to this assertion in her subsequent affidavit are Tameka's own representations in the relinquishment document,[25] which sharply contradict her current assertions of duress, that she "fully understand[s] the consequences of this decision;" she has "read and discussed thoroughly with [her] attorney all the abovementioned rights;" she "fully understand[s] the meaning and consequences of executing this document;" she has "not been induced, coerced or threatened into signing this document;" and she "freely, knowingly, intelligently and voluntarily relinquish[es] all [her] parental rights to Cesar A[.] L[.]"

The above-quoted statements contained in Tameka's relinquishment constitute judicial admissions by which she is bound and which she cannot now deny. *See* Syl. pt. 4, *State v. McWilliams,* 177 W.Va. 369, 352 S.E.2d 120 (1986) ("A judicial admission is a statement of fact made by a party in the course of the litigation for the purpose of withdrawing the fact from the realm of dispute."). "The significance of such an admission is that it 'will stop the one who made it from subsequently asserting any claim inconsistent therewith.' " *Wheeling–Pittsburgh Steel Corp. v. Rowing,* 205 W.Va. 286, 302, 517 S.E.2d 763, 779 (1999) (quoting *Clark v. Clark,* 70 W.Va. 428, 433, 74 S.E. 234, 236 (1912) (additional citations and quotations omitted)). *Accord Keller v. United States,* 58 F.3d 1194, 1198 n. 8 (7th Cir.1995) ("Judicial admissions are formal concessions ... or stipulations by a party or its counsel ... that are binding upon the party making them. They may not be controverted at trial or on appeal."). Because Tameka is bound by the admissions contained in her relinquishment, we cannot condone her present attempts to recant these statements absent clear and convincing evidence of the duress to which she claims to have been subject at the time thereof.

Furthermore, because Cesar is the *fourth* child who the DHHR has removed from Tameka's custody as the result of an abuse and neglect proceeding, it may be presumed that Tameka is familiar with the abuse and

---

**24.** See *supra* note 23 for the contents of Tameka's affidavit.

**25.** *See* note 22, *supra.*

neglect process. The fact that Tameka's parental rights to three of these children have been involuntarily terminated makes her present assertions that she did not appreciate the full import of her relinquishment even less convincing. In deciding this case, the circuit court determined that Tameka had failed to sustain her burden of proof, and, having reviewed the record in this case, we agree with the circuit court's ruling. Accordingly, the December 14, 2006, order of the Circuit Court of Berkeley County is affirmed.

## IV.

## CONCLUSION

For the foregoing reasons, the October 11, 2006, order and the December 14, 2006, order of the Circuit Court of Berkeley County are hereby affirmed.

Affirmed.

BENJAMIN, Justice, concurring.

This case is not about the mother. It is about Cesar L. It is about his welfare. The mother had counsel. The mother voluntarily relinquished her maternal rights. There was no fraud. There was no duress. This voluntary relinquishment was notarized. Cesar L. is entitled to permanency and stability. Judge Silver ruled correctly and in the best interests of this child. I concur in this affirmation.

ALBRIGHT, Justice, concurring in part, dissenting in part.

I concur with the majority opinion on the very limited basis that it reaches the proper legal result for the facts of the underlying case. I write separately to register my firm dissent to the manner in which the majority has seen fit to unreasonably extend its decision to facts not before the Court. I fear that the majority's zeal to eliminate entirely the possibility that biological parents might seek modification of court decisions involuntarily terminating parental rights in an abuse and neglect case wrongly establishes a new point of law. That new point of law overlooks the constitutional limitations of this Court, ignores legislative intent and disre-

gards prior post-termination visitation rulings of this Court. The specific language of the majority opinion to which I refer appears in syllabus point four of the majority opinion and reads, in pertinent part: "A final order terminating a person's parental rights, *as the result of either an involuntary termination* or a voluntary relinquishment of parental rights, completely severs the parent-child relationship," thus denying such parents standing to seek modifications.

The underlying action involved a mother who *voluntarily* relinquished her parental rights. She subsequently sought to revoke her relinquishment and petitioned for modification of the abuse and neglect dispositional order pursuant to the provisions of West Virginia Code § 49–6–6 (1977) (Repl.Vol. 2004). Section 4, article VIII of the West Virginia Constitution provides in relevant part that "[w]hen a judgment or order of another court is reversed, modified or affirmed by the [supreme] court, every point fairly arising upon the record shall be considered and decided." This Court has taken the enforcement of this provision seriously by entertaining and deciding only those matters fairly arising from the record. Syl. Pt. 9, *State v. Comstock*, 137 W.Va. 152, 70 S.E.2d 648 (1952) ("Under the West Virginia Constitution, . . . when a judgment or decree is reversed or affirmed by this Court, the Court will not consider and decide a point which does not fairly arise upon the record of the case."); *Thornton v. CAMC*, 172 W.Va. 360, 364, 305 S.E.2d 316, 320–21 (1983) (appellate review must be limited to those issues which appear in the record). The majority improvidently declined to adhere to this long-recognized, self-imposed restriction. Instead, the majority extends its holding to include cases involving involuntary termination of parental rights, a circumstance not present in this case. The issue was not raised in the facts and the issue was not properly developed before this Court through brief and argument. As a result the majority's decision is ill-considered and fatally flawed.

It is equally disconcerting that the conclusion reached in the majority opinion clearly ignores legislative intent. Proper reading of the statutory provision regarding modifica-

tion necessarily results in the conclusion that a biological parent is permitted to seek modification of a dispositional order in an abuse or neglect case. The statute expressly provides that a motion to modify a dispositional order may be made by a "child, a child's parent or custodian or the state department" and "[t]hat a dispositional order pursuant to subdivision (6), subsection (a) of section five [§ 49–6–5(a)(6)] shall not be modified after the child has been adopted;" W.Va.Code § 49–6–6. West Virginia Code § 49–6–5(a)(6) (2002) (Repl.Vol.2004) includes the circumstances under which a court may proceed to involuntarily terminate parental rights. By using a direct internal cross-reference to the termination of parental rights provision, the Legislature has expressed the intent that biological parents whose rights have been judicially terminated have a narrow window of opportunity to seek modification of dispositional orders. The majority wrongly rebuffs that clear legislative intent in order to announce a judicially created social policy that closes the door in child abuse and neglect cases to modification by any natural parent, including those whose parental rights are involuntarily terminated by judicial decree.

Furthermore, by its holding the majority has created a conflict with established case law allowing post-termination visitation. No mention is even made in the majority opinion of the decision authored by Justice Cleckley in 1995 in the case of *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995). The relevant and significant holding in *Christina L.* involved the recognition that a close emotional bond between a parent and child may exist even when parental rights are terminated in abuse and neglect cases and that continued visitation or other contact may be in the best interests of the child. *Id.* at Syl. Pt. 5. It is not surprising that the majority ignores *Christina L.* because any effort to distinguish that case would be at best disingenuous since visitation under *Christina L.* is conditioned upon the existence of a close emotional bond *between* the parent and child. Without addressing *Christina L.*, the majority has inappropriately created conflict in this very difficult and particularly sensitive area of the law.

At first blush, the approach taken in the majority opinion seemingly streamlines the adoption process by reducing potential impediments for placement of children who have been victims of abuse and neglect. However, it also turns a blind eye to what the future actually holds for too many of these children. Adoption often is not a viable possibility for "special needs children." Like it or not, the reality is that some children will never be candidates for adoption because of their age, mental or physical disability, race or other factor, and they will simply languish in foster care for any number of years. It is possible that a parent whose rights have been involuntarily terminated could, over time, effect a change in circumstances which would support countermanding the termination decision. It may very well be that it is these children the Legislature contemplated would be protected and served by the policy it adopted by enacting the modification statute and providing that narrow window of opportunity.

I do not understand the majority's desire to so drastically restrict the standing of parents whose rights have been judicially terminated to seek modification. Having standing to apply for modification and attaining modification are far from synonymous. A natural parent seeking to overturn a termination decision has an exceptionally heavy burden to overcome in proving timeliness of the motion, fitness to be a parent, the validity of the claimed change in the parent's errant ways and finally, the lodestar—that the change would be in the best interests of the child. It is the quantum of proof and not the elimination of the opportunity that has governed and should govern the rare modification of termination orders in abuse and neglect cases. *See Overfield v. Collins*, 199 W.Va. 27, 483 S.E.2d 27 (1996) (setting forth burdens and quantum of proof in proceeding by natural parent to regain custody of child either permanently or temporarily transferred to third party).

In sum, I concur with the majority's affirmance of the rulings of the court below in the instant case because no clear error was proven as to application by the lower court of the

facts to the law with regard to voluntary relinquishment of parental rights.[1]However, I adamantly dissent from the majority's reaching beyond the matters fairly arising upon the record in order to foreclose the opportunity of natural parents whose rights have been involuntary terminated to seek modification of dispositional orders in abuse and neglect case. The majority's policy statement is contrary to the expressed intention of the Legislature, is at odds with prior case law regarding post-termination visita-

tion, and engineers a poor social policy by judicial fiat. As a result, I concur, in part, and dissent, in part.

I am authorized to state that Justice Starcher joins in this separate opinion.

---

1. Of course, a person retains standing to challenge the existence of a valid voluntary relinquishment. Although Appellant's contest of the validity of the relinquishment was unsuccessful in this case, that challenge was rejected on the merits by both this Court and the lower court, not on the basis of a lack of standing.